## CONSTRUCTORS SUPPLY COMPANY, d.b.a. HARRIS PLUMBING & HEATING COMPANY, v. BOSTROM SHEET METAL WORKS, INC.

190 N. W. (2d) 71.

August 20, 1971—No. 42562.

*Leonard, Street & Deinard, Harold D. Field, Jr., Frederick C. Blackledge,* and *Nancy C. Dreher,* for appellant.

*Robins, Davis & Lyons, Solly Robins,* and *Steven H. Goldberg,* for respondent.

Heard before Knutson, C. J., and Nelson, Peterson, Kelly, and Rolloff, JJ.

NELSON, JUSTICE.

Appeal from a judgment of the Ramsey County District Court entered April 16, 1970, in favor of plaintiff-respondent, Constructors Supply Company, against defendant-appellant, Bostrom Sheet Metal Works, Inc., in the sum of $9,848.

The action was brought by plaintiff, a mechanical contractor doing business as Harris Plumbing & Heating Company, to recover damages suffered when defendant, Bostrom Sheet Metal Works, Inc., a subcontractor, withdrew a bid it had submitted to plaintiff and which plaintiff had considered in arriving at its prime bid before submitting the prime bid on a construction project. Plaintiff was subsequently awarded the mechanical contract on the project, the construction of a classroom-laboratory building for the University of Minnesota; but because of defendant's withdrawal of its bid, plaintiff had to search for and employ new subcontractors to perform the ventilation work on the project.

The pertinent facts are as follows: Defendant, a ventilation contractor, learned of the proposed construction of the building at the University of Minnesota in May 1968. Defendant contacted the architect-engineer on the project and obtained plans and specifications in order to prepare a bid as subcontractor. Since the ventilation work was included in the prime mechanical contract, defendant was to submit its bid to the mechanical contractors who were bidding on the project. The prime mechanical bids on the project were due at the university at 2 p. m. June 12, 1968. Defendant prepared its bid of $372,000 for the ventilation work and on the morning of June 12 contacted plaintiff and three other mechanical contracting firms by telephone and submitted its bid to them. Defendant's bid was prepared by Richard Bostrom, defendant's corporation secretary and estimator, and it was he who submitted the bids to the prime contractors.

Richard Bostrom personally spoke with plaintiff's vice president, Jerome Sandin, who was in charge of procuring bids from subcontractors on the ventilation work, about 2 hours before the prime bids were due. The two men went over the items on which defendant was bidding, including the price, on the telephone. Sandin called Bostrom back after a few minutes and asked him if he were sure of his price. Bostrom replied, "Of course. I will take the contract right now." Sandin's reply was, "Okay. Fine."

Defendant's bid was the lowest submitted to plaintiff for ventilation work on the building, and it was used by plaintiff in computing its prime mechanical bid, which was submitted at 2 p. m. June 12, 1968. At that time all of the prime bids were opened and read, and plaintiff was found to be the low bidder for the prime mechanical portion of the project.

Several days later defendant notified plaintiff by telephone that it was withdrawing its bid because it had discovered substantial errors in it. On June 27, 1968, defendant wrote plaintiff a letter confirming the withdrawal but submitting a new bid of $421,000 for the ventilation work. Plaintiff on that same day wrote defendant, formally accepting the bid of $372,000 and indicating its desire to sign a contract should the project be awarded. Later plaintiff made attempts to renegotiate the ventilation contract with defendant.

On July 31, 1968, plaintiff wrote defendant, informing it that plaintiff had been awarded the mechanical contract, and advised defendant that if defendant would not enter an agreement to do the work for $372,000, plaintiff would award the ventilation subcontract to the next lowest bidder and would seek compensation from defendant for any additional costs. Plaintiff subsequently contacted other ventilation contractors and eventually contracted the ventilation work with two other firms. Suit was later instituted to recover the additional costs, and plaintiff obtained the judgment from which defendant has appealed.

The main issues are (1) whether the doctrine of promissory estoppel is applicable to bind a subcontractor to the bid it offers to a prime contractor who does not finally accept that bid but relies on it by incorporating it into the prime bid which it submits; and (2) whether the evidence justifies the application of promissory estoppel in the case at bar.

In granting judgment for plaintiff, the trial court based its decision on the bidding practices of the construction industry in the area. It was brought out at trial that subcontractors and contractors customarily negotiate on the telephone in submitting

their bids. The subcontractors itemize their various costs by computing them from the plans and specifications of the project, and when they come up with final figures, they submit them as bids to the prime contractors who use these bids in arriving at their own bids. At times a subcontractor himself has subcontracted various items of the project on which he wishes to bid, and he must receive bids from his subcontractors before he can submit a complete figure to the prime contractors. This whole process usually culminates on the day that the prime bids are due on the project. Much telephoning and hurried activity takes place between the prime contractors and subcontractors in an effort to prepare bids before the prime bid deadline. It was also brought out at trial that subcontractors customarily agree to be bound by the bids they submit to prime contractors and that prime contractors act in reliance on these bids when they submit their own bids to the owner.

Taking these practices into account, the trial court found that plaintiff relied on defendant's bid for the ventilation work in submitting the prime mechanical bid. The trial court concluded that the doctrine of promissory estoppel was properly applicable in the circumstances and entitled plaintiff to recover the damages it sustained as a result of defendant's refusal to perform the work at its original bid price. We affirm.

The doctrine of promissory estoppel, or as it is sometimes called, justifiable reliance, is set forth in Restatement, Contracts, § 90, which states:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

The doctrine has been characterized by some courts as a species of or substitute for consideration. See, Porter v. Commr. of Internal Revenue (2 Cir.) 60 F. (2d) 673, affirmed, 288 U. S. 436, 53 S. Ct. 451, 77 L. ed. 880; Allegheny College v. National

Chautauqua County Bank, 246 N. Y. 369, 159 N. E. 173, 57 A. L. R. 980. Other courts have called it a reliance doctrine. Schafer v. Fraser, 206 Ore. 446, 290 P. (2d) 190, 294 P. (2d) 609; Annotation, 48 A. L. R. (2d) 1069.

Promissory estoppel has been accepted but has had limited consideration by the courts in this state. It has been applied in charitable subscription cases. See, Albert Lea College v. Brown, 88 Minn. 524, 93 N. W. 672, 60 L. R. A. 870; Horan v. Keane, 164 Minn. 57, 204 N. W. 546. It was also recognized and applied in Albachten v. Bradley, 212 Minn. 359, 3 N. W. (2d) 783, in which we held a debtor estopped to plead the statute of limitations where, by promising that he would later make a new arrangement or settle the plaintiff's claim, he induced plaintiff to forbear suit until after the statute had run.

There is a split of authority among the courts which have considered the applicability of the doctrine to the situation at hand. Defendant relies on that line of authority which holds that promissory estoppel does not apply to make a subcontractor's bid irrevocable where the prime contractor has not accepted the bid, even though the prime contractor may have relied on the bid by using it in its own bid. See, James Baird Co. v. Gimbel Bros. Inc. (2 Cir.) 64 F. (2d) 344; Milone & Tucci, Inc. v. Bona Fide Builders, Inc. 49 Wash. (2d) 363, 301 P. (2d) 759; Southeastern Sales & Serv. Co. v. T. T. Watson, Inc. (Fla. App.) 172 So. (2d) 239; Tatsch v. Hamilton-Erickson Mfg. Co. 76 N. Mex. 729, 418 P. (2d) 187.

In the Baird case plaintiff contractor received defendant's bid for a linoleum subcontract on the same day as its own prime bid was due on the construction of a public building. Defendant withdrew its offer and substituted another later that day, but the withdrawal telegram reached plaintiff subsequent to its submission of a lump-sum prime bid based in part on defendant's original bid. Plaintiff's prime bid was accepted 2 days later, and it formally accepted defendant's original offer shortly thereafter. Defendant refused to perform, and plaintiff brought suit for

damages. Judge Learned Hand held that no contract had ever arisen between the contractor and subcontractor, as there had been no acceptance of defendant's bid when it was received by plaintiff, even though plaintiff relied on defendant's bid in making the prime bid. Judge Hand also rejected the application of promissory estoppel to bind the subcontractor, stating (64 F. [2d] 346):

"* * * Offers are ordinarily made in exchange for a consideration, either a counter-promise or some other act which the promisor wishes to secure. * * * But an offer for an exchange is not meant to become a promise until a consideration has been received, either a counter-promise or whatever else is stipulated. * * * In the case at bar the defendant offered to deliver the linoleum in exchange for the plaintiff's acceptance, not for its bid, which was a matter of indifference to it. That offer could become a promise to deliver only when the equivalent was received; that is, when the plaintiff promised to take and pay for it. There is no room in such a situation for the doctrine of 'promissory estoppel.' "

Contrary to the above cases is the line of authority, cited by plaintiff, which applies promissory estoppel to the construction bidding situation, not, plaintiff contends, as a doctrine which adds an essential contract element to the facts, but as one providing an independent basis of enforcement of the contract based on the facts of bidding procedure, the division of risks between the prime contractor and subcontractor, and an attempt to allow the system of bidding to operate with a minimum of injustice. See, Drennan v. Star Paving Co. 51 Cal. (2d) 409, 333 P. (2d) 757; Norcross v. Winters, 209 Cal. App. (2d) 207, 25 Cal. Rptr. 821; Northwestern Engineering Co. v. Ellerman, 69 S. D. 397, 10 N. W. (2d) 879; E. A. Coronis Associates v. M. Gordon Const. Co. 90 N. J. Super. 69, 216 A. (2d) 246; Air Conditioning Co. of Hawaii v. Richards Const. Co. (D. Hawaii) 200 F. Supp. 167, affirmed sub nom. Richards Const. Co. v. Air Conditioning Co.

of Hawaii (9 Cir.) 318 F. (2d) 410; Reynolds v. Texarkana Const. Co. 237 Ark. 583, 374 S. W. (2d) 818.

In the Drennan case, on facts similar to those in the case at bar, the California Supreme Court, in an opinion by Mr. Justice Traynor, applied the doctrine of promissory estoppel to prevent a subcontractor's revocation of its bid, stating (51 Cal. [2d] 415, 333 P. [2d] 760):

"When plaintiff used defendant's offer in computing his own bid, he bound himself to perform in reliance on defendant's terms. Though defendant did not bargain for this use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract. It was bound to realize the substantial possibility that its bid would be the lowest, and that it would be included by plaintiff in his bid. It was to its own interest that the contractor be awarded the general contract; the lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater its chance of acceptance and hence the greater defendant's chance of getting the paving subcontract. Defendant had reason not only to expect plaintiff to rely on its bid but to want him to. Clearly, defendant had a stake in plaintiff's reliance on its bid. Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him."

In the Ellerman case, the South Dakota Supreme Court stated (69 S. D. 408, 10 N. W. [2d] 884):

"* * * We cannot believe that by accepting this doctrine [promissory estoppel] as controlling in the state of facts before us we will abolish the requirement of a consideration in contract cases, in any different sense than an ordinary estoppel abolishes some legal requirement in its application. We are of the opinion, therefore, that the defendants in executing the agreement made

a promise which they should have reasonably expected would induce the plaintiff to submit a bid based thereon to the Government, that such promise did induce this action, and that injustice can be avoided only by enforcement of the promise."

In the Reynolds case, the court stated (237 Ark. 585, 374 S. W. [2d] 820):

"* * * Justice demands that the loss resulting from the subcontractor's carelessness should fall upon him who was guilty of the error rather than upon the principal contractor who relied in good faith upon the offer that he received."

We find the reasoning in the Drennan, Ellerman, and Reynolds cases as to the function and applicability of promissory estoppel to be the more persuasive. Promissory estoppel is not a substitute for acceptance, consideration, or mutuality, but a doctrine based on reliance which courts may use in a proper case to prevent injustice.

It appears to us that in the instant case the proof establishes that plaintiff received a clear and definite offer from defendant; that defendant could expect plaintiff to place substantial reliance on the offer; that plaintiff reasonably relied thereon to its detriment by using defendant's bid in preparing its own prime bid, with which it was required to furnish a bid bond in the amount of 5 percent of its bid; and that defendant's withdrawal caused plaintiff financial detriment. We must therefore conclude that plaintiff established a cause of action based on promissory estoppel and the trial court could properly apply the doctrine in order to grant relief.

Defendant contends, however, that promissory estoppel should not apply because (1) neither party expected to be bound by the figure which defendant submitted and plaintiff used on its bid; (2) plaintiff was not entitled to rely on defendant's bid since plaintiff suspected the bid was erroneous; and (3) plaintiff did not suffer irreparable detriment. Viewing the evidence in the light most favorable to plaintiff, as we must, we do not think that it bears out defendant's contention.

Defendant in raising its first point quotes from Drennan v. Star Paving Co. 51 Cal. (2d) 409, 415, 333 P. (2d) 757, 760:

"It bears noting that a general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer."

The two processes noted above are known as "bid shopping" and "bid chopping" in the construction industry. "Bid shopping" is the general contractor's use of the low bid already received by him to pressure other subcontractors into submitting even lower bids. "Bid chopping" on the other hand is the practice of subcontractors voluntarily reducing their own bids or trying to get under the low bid in order to get the subcontract from the general contractor.

Defendant contends that "bid shopping" and "bid chopping" are so common to the Twin Cities area construction industry that prime contractors and subcontractors do not expect to be bound by prices submitted by the subcontractors to the prime contractors and that defendant was therefore not bound on its bid on the ventilation work because further and final negotiations would take place at a later time.

While we approve of neither of the above practices, there was no conclusive evidence of bid shopping or bid chopping in the instant case. Richard Bostrom testified that he knew of two previous jobs on which plaintiff had bid-shopped. However, the only other witnesses defendant called to reinforce this proposition contradicted it by saying that plaintiff did not "bid shop." With regard to "bid chopping," defendant asserts that plaintiff could have accepted defendant's bid on June 12, 1968, when it was made, or shortly thereafter, but did not accept it in order to be free to "entertain" other bids for the ventilation work.

Plaintiff's witness Sandin testified that plaintiff conditionally accepted subcontract bids in about 50 percent of the cases when they were first offered, depending on the size of the job involved.

Sandin testified that on the bigger jobs, such as the university project, subcontracts were let only after plaintiff knew it had been awarded the prime contract. The university had 45 days in which to award the mechanical contract on the university project after the bids were received, and although plaintiff knew it was the low bidder, it did not know whether the university would let the mechanical contract on its bid figure. The claim that plaintiff was delaying acceptance of subcontractors' bids so that it could entertain bid chops is contrary to the evidence.

Defendant contends also that plaintiff could not justifiably rely on defendant's bid of $372,000 because it was so much lower than the next lowest bid received, $405,000, that there was reason to suspect defendant had made an error. It points to Sandin's return call to Richard Bostrom as evidence of plaintiff's suspicion of error. Sandin testified, however, that defendant's low bid was within 10 to 11 percent of the next lowest bid; that this was not unusual; that the call back was to confirm the figure because it was going to be used in plaintiff's bid; and that from the call Bostrom could infer that he had submitted the low bid on the ventilation work. Richard Bostrom also testified that the bids defendant received on part of the ventilation work that it was going to subcontract on the university project varied from $8,000 to $21,000, and that defendant unquestioningly took the $8,000 low bid. This evidence, it would appear, renders defendant's contention that plaintiff was aware of the mistake in defendant's bid of little probative value and justifies the trial court's finding that plaintiff acted in reliance on defendant's bid.

Defendant's final contention, that plaintiff cannot invoke the doctrine of promissory estoppel because it did not suffer irreparable detriment, has little merit. The trial court found that following defendant's withdrawal plaintiff was able to mitigate damages by a saving of $5,880 in the electrical portion of the entire mechanical contract, but sustained a net loss of $9,848 due to defendant's refusal to perform the subcontract.

We recognize the possibility of unfairness in an arrangement

under which a subcontractor was held to its bid while a prime contractor could bid shop or allow bid chopping because it has not accepted the subcontractor's bid. The allegations of bid shopping and bid chopping are not borne out by the evidence in the record of this case, however, and plaintiff's reliance on the sub-bid to its detriment is clearly established. Under the circumstances of this case, we conclude that the doctrine of promissory estoppel was properly applied.

Affirmed.