**LAMB PLUMBING & HEATING CO., Respondent,**

v.

**KRAUS–ANDERSON OF MINNEAPO-LIS, INC., Appellant.**

**No. 50411.**

Supreme Court of Minnesota.

Aug. 29, 1980.

Dorsey, Windhorst, Hannaford, Whitney & Halladay and Steven K. Champlin, Minneapolis, for appellant.

Robins, Davis & Lyons, Stanley E. Karon, and Maury S. Landsman, St. Paul, for respondent.

Heard before OTIS, PETERSON, and SCOTT, and considered and decided by the court en banc.

SCOTT, Justice.

Plaintiff Lamb Plumbing & Heating Co. (Lamb) brought this action against Kraus-Anderson of Minneapolis, Inc. (Kraus-Anderson) to recover the value of certain work done on a wastewater treatment construction project. The matter was tried in Hennepin County District Court without a jury.

The trial court ordered judgment for plaintiff. Defendant appeals from the trial court's order denying its motion for a new trial or for amended findings. We affirm.

In June, 1974, the Metropolitan Sewer Board began advertising for competitive bids on a public contract to construct a wastewater pretreatment facility at its Pig's Eye site (the facility is designated as Project 71–06). The contract documents were prepared by Toltz, King, Duvall, Anderson and Associates, Inc. These documents include a specifications book, general conditions, plans, drawings, and schedules. The contract was to be awarded to a single prime contractor. Contract bids were due on August 13, 1974.

Defendant Kraus-Anderson decided that it would present a bid as prime contractor for the project, doing 40% of the construction itself and subcontracting the rest. Kraus-Anderson obtained plans and specifications for the project three or four weeks prior to the bid date. At approximately the same time, plaintiff Lamb also obtained the plans and decided to bid for a subcontract for mechanical work, set out in Division 15 of the contract. Lamb submitted bids for the mechanical work to various potential prime contractors, and Kraus-Anderson in turn solicited bids from subcontractors for various portions of the project, including the mechanical work. Several witnesses testified that the submission and acceptance of subcontracting bids for a large project such as this one is a last-minute, hectic affair, as the contractors compete for the best price. Lamb bid for the mechanical work with Kraus-Anderson shortly before Kraus-Anderson's general bid was due, on August 13. Kraus-Anderson accepted Lamb's bid, and was awarded the prime contract for $13,048,989. Within a few months, this dispute arose between Lamb and Kraus-Anderson as to whether certain valves and wall pipes or fittings were to be provided by the mechanical subcontractor or the force main subcontractor. Neither party wished to delay the project because of

the dispute, and therefore plaintiff and defendant executed a subcontract for performance of the mechanical work, including the disputed items, and agreed that the dispute would be resolved later. The parties stipulated that the value of the disputed work was $96,401.84.

Project 71–06 was designed to provide additional sewage treatment capacity at the Pig's Eye facility in St. Paul. The sewage was to be partially treated at a South St. Paul plant, and then transferred to Pig's Eye by means of a 48-inch diameter force main pipe. At the Pig's Eye site, the force main pipe was to take the sewage through a concrete wall into a meter vault located underground (used to measure the volume of sewage), out of the vault through a concrete wall, and then through a third wall into a valve pit. The valve pit, also located underground, was to contain two 48-inch gate valves. These gate valves could be used to direct the flow of sewage into a large main facility (constructed as part of the same project) or into an adjacent facility.

The mechanical subcontract for Project 71–06 required plaintiff to do work inside the various structures. The force main subcontractor, J. & T. Contractors, was responsible for the construction of the force main pipe. The dispute in this case between plaintiff and Kraus-Anderson involves the question of whether the mechanical subcontractor (plaintiff) or the force main subcontractor was required by the contract to provide the two 48-inch gate valves located within the valve pit and the five wall pipes or wall fittings needed to carry the force main pipe in and out of the meter vault and the valve pit. Plaintiff contends that these items are included under Division 2 of the contract specifications and not under Division 15, the mechanical division for which it bid. The problem arises because the valves and wall fittings are referred to in both divisions of the contract and drawings, and their locations and functions are such that they could logically be included under either subcontract.

The trial court concluded that Kraus-Anderson, but not plaintiff, was aware of the potential conflict in subcontracts prior to the time that it accepted plaintiff's bid for the mechanical work. The trial court found that Mr. Simpkins, the project manager for Kraus-Anderson, had a conversation with Mr. Frost of J. & T. Contractors (the force main subcontractor) one day before the prime bid was due, during which Frost told Simpkins that he was confused about who should provide the valves and wall fittings. Frost advised Simpkins that he was excluding them from his bid because someone at the engineering office told him that the disputed items were under the mechanical section. The mechanical bidders on Simpkins' list of specification holders were told that they should include the disputed items in their bid, but plaintiff was not on this list. The trial court found that plaintiff was not told about this decision and was not aware of any ambiguity in the contract as to the disputed items. According to plaintiff's interpretation of the contract, the disputed items were to be supplied by the force main subcontractor; therefore, plaintiff did not include these items in its bid calculations. Kraus-Anderson did not mention the disputed items to plaintiff when it accepted plaintiff's bid.

The trial court concluded that the contract was not ambiguous as to which subcontractor should supply the 48-inch gate valves, and that the force main subcontractor was responsible for them. The trial court held that the contract was ambiguous as to who was to provide the five wall fittings. Without resolving the ambiguity, the court found that plaintiff did not believe that there was an ambiguity, that plaintiff's analysis of the contract was reasonable, and that Kraus-Anderson was aware of the potential conflict. The trial court therefore concluded that because Kraus-Anderson failed to clear up a known potential conflict plaintiff should not be held responsible for providing the wall fittings.

1. Defendant Kraus-Anderson challenged several aspects of the trial court's

decision. Defendant contends that the contract provisions are not ambiguous as to either the gate valves or the wall fittings, and that the contract clearly requires the mechanical subcontractor to provide all of them. Defendant argues in the alternative that if the contract is ambiguous, a new trial is required to properly weigh all the factors which should be considered in resolving an ambiguity.

■■■ A contract is ambiguous if it is susceptible to more than one interpretation based on its language alone. *See, Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 205 N.W.2d 121 (1973); *Telex Corp. v. Data Products Corp.*, 271 Minn. 288, 135 N.W.2d 681 (1965). The initial question of whether a contract is ambiguous is a question of law to be decided by the trial court, and therefore this court on appeal is not bound by the trial court's determination. *Otten v. Stonewall Insurance Co.*, 511 F.2d 143, 147 (8th Cir. 1975), *appeal after remand*, 538 F.2d 210 (1976); *Employers Liability Assurance Corp. v. Morse*, 261 Minn. 259, 263–64, 111 N.W.2d 620, 624 (1961); *Noreen v. Park Construction Co.*, 255 Minn. 187, 190–91, 96 N.W.2d 33, 36 (1959).

■■■ We conclude that the contract in question is ambiguous as to who is to supply both the 48-inch valves and the wall fittings. Although the trial court determined that the contract does not include the 48-inch valves in the mechanical work, there is enough support in the contract documents for the contrary position to create an ambiguity. In support of the position that the valves are to provided under Division 2, the force main division, plaintiff and the trial court note the following: the 48-inch valves are described in much greater detail in Division 2, § 02554, ¶ 6, than in Division 15, § 15120, ¶ 4.[1] Although both paragraphs are directional and mandatory in tone, the

greater specificity in Division 2 suggests that the subcontractor for Division 2 is expected to provide the valves. Moreover, the Division 2 description is cross-referenced to Division 15 and the general specifications for all valves contained therein. In addition, viewing the contract as a whole, most of plaintiff's work is "inside work," to be performed within the main facility of Project 71–06. The contract describes mechanical work to be done outside this facility with particularity; the reference to the 48-inch valves in § 15120, ¶ 4, is especially vague when compared to the directions for other mechanical work to be done by plaintiff outside of the main facility. Finally, both the bid proposal in the specifications book and the shop drawing list the 48-inch valves under § 02554.

Defendant, on the other hand, points out that § 15120, ¶ 2, entitled "Scope," includes the furnishing and installation of "all valves and related operating devices." Section 15120, ¶ 4, does in fact describe the 48-inch valves, in addition to many other valves that plaintiff is expected to provide. Plaintiff's mechanical subcontract includes the piping and other equipment within the valve pit, and it seems more logical for plaintiff to provide all of the equipment within the pit rather than have another contractor provide only two items. Finally, two drawings in the mechanical division drawings, M–4 (Major Valve Schedule) and M–303, specifically show the 48-inch valves as well as many other valves to be installed by plaintiff. However, plaintiff points out that various items may be included on one drawing to save space or to give a more complete picture of the entire project. Furthermore, drawing M–303 specifically refers the reader to the general plans.

Based on the above considerations, we conclude that the contract provisions dealing with the two 48-inch valves are "susceptible to more than one interpretation," and therefore ambiguous.

---

1. Selected paragraphs from the contract specifications book are contained in the appendix to this opinion.

We also agree with the trial court's holding that the contract is ambiguous as to who is to supply the wall fittings. Defendant Kraus-Anderson states in its brief that the trial court confused wall sleeves with wall fittings in its memorandum.[2] Although this is probably correct, it does not affect the validity of the trial court's conclusion that an ambiguity is raised by Divisions 2 and 15 regarding wall fittings.

Section 02554 requires the Division 2 subcontractor to provide all of the force main pipe within the plant site. Paragraph 3 of § 02554, entitled "Scope," states that the work covered in this division includes all materials and equipment necessary to construct the force main. Paragraph 9 of § 02554 requires the force main contractor to supply connecting pieces to the meter vault and to the valve and cleanout structure, and gives specifications for the pipe and fittings in detail. Finally, the bid proposal and the shop drawing register include the fittings under § 02554. On the other hand, § 15111, ¶ 7, requires the mechanical subcontractor to furnish and install pipes and fittings for the interior sections of the 48-inch force main. Arguably, the wall connecting pieces are "interior." These various provisions of the contract create an ambiguity as to who is responsible for the five wall fittings.

2. As noted above, the trial court found that shortly before all bids were due Kraus-Anderson learned from Mr. Frost of J. & T. Contractors that Frost did not think that the valves and fittings were to be supplied by the force main subcontractor. Frost informed Kraus-Anderson that J. & T.'s subcontract bid would not include the disputed items. The trial court also found

that plaintiff did not think that the contract was ambiguous, and that plaintiff reasonably assumed that these items were to be provided by the force main subcontractor.

Defendant contends that these findings are contrary to the evidence presented at trial. We have stated that a trial court's factual findings will not be disturbed on appeal unless they are clearly erroneous. *Werner v. Miller*, 248 Minn. 75, 79, 78 N.W.2d 63, 66 (1956).[3] After reviewing the record, we conclude that the trial court's factual findings in the present case are more than adequately supported by the evidence.

3. Because plaintiff reasonably believed that the contract was not ambiguous, and because Kraus-Anderson was aware of the ambiguities but did not inform plaintiff, the conflict in interpretation must be resolved in favor of plaintiff in accordance with the principle we enunciated in *Paul W. Abbott, Inc. v. Axel Newman Heating & Plumbing Co., Inc.*, 282 Minn. 493, 166 N.W.2d 323 (1969). In that case, the City of St. Paul awarded a general contract to Axel Newman to build two firehouses. The city discussed certain portions of the plans and specifications with Axel Newman, and the two parties reached an understanding on certain work which was ambiguously described in the plans and specifications: they concluded that all of the domestic water piping should be included in a certain division of the contract. Axel Newman subcontracted this division of the work to Paul W. Abbott, Inc., but did not advise Abbott of the contract interpretation made by Axel Newman and the city. Later, a dispute arose between Abbott and Axel Newman as

---

2. Both wall sleeves and wall fittings are used to carry large pipes through concrete walls. A sleeve is a cylinder of metal at least as long as the thickness of the wall. The concrete for the wall is poured around the sleeve and the pipe is passed through the metal opening. A wall fitting is similarly embedded in the concrete wall, but the pipe is then connected to either side of the fitting and the fitting becomes a direct part of the pipe. The five connecting pieces at issue

in this case are wall fittings, not sleeves. The trial court used these terms interchangeably, and inappropriately quoted § 15111, § 3, dealing with wall sleeves.

3. Similarly, Minn.R.Civ.P. 52.01 indicates in relevant part that "[f]indings of fact shall not be set aside unless clearly erroneous * * *."

to who was required to install the domestic water piping. We held that because Axel Newman failed to inform Abbott about the conversation between Axel Newman and the city, Abbott was entitled to recover the reasonable value of its installation of the domestic water piping. The opinion concluded:

> Although the ambiguity inherent in the language of the specification was clarified in so far as Newman is concerned before he submitted his bid for the plumbing work at the two fire houses, there was no such clarification of the ambiguity in so far as Abbott, the subcontractor, was concerned. No one connected with Newman ever relayed to Abbott the conversation which the trial court found to have occurred as between Newman and the city. As to Abbott, therefore, the specifications did not require the installation of all domestic water piping and he was entitled to recover from Newman the reasonable worth and value of this work done at Newman's request and in fulfillment of Newman's obligation to the city.
>
> * * * It is because Newman failed to transmit the information then received to Abbott before accepting Abbott's bid on the subcontract, and for that reason only, that Newman now finds itself in the position of being obligated to the city for a greater quantum of contractual performance than it can demand from its subcontractor.

*Id.*, at 495–96, 166 N.W.2d at 325.

The Court of Appeals for the Ninth Circuit was faced with a similar issue in *United States v. Haas & Haynie Corp.*, 577 F.2d 568 (9th Cir. 1978). There, a subcontractor sued the prime contractor for an extra charge for materials delivered to the prime contractor. The trial court found that the prime contractor had reason to know of the meaning assigned to a portion of the contract by the subcontractor. Based on this finding, the court of appeals concluded, "[I]f only one party knows or has reason to know of the conflict in meaning, the contract will be interpreted in favor of the party who does not know of the conflict." *Id.*, at 573. This principle is also summarized in two treatises on contracts. In J. Simpson, *Handbook of the Law of Contracts* § 42 (2d ed. 1965), the author states:

> Where one of the parties knows of the ambiguity and the other does not, and he does nothing to clarify the agreement though he must know that the other party may attach the alternative meaning to the ambiguous term than the meaning he himself attaches to it, he is bound on the contract in accordance with the interpretation placed by the other party upon the ambiguous expression used.

*Id.* (footnote omitted). The Restatement (Second) of Contracts § 227 (Tent. Draft No. 5 (1970)) states in part:

> (2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
>
> * * * * * *
>
> (b) that party has no reason to know of any different meaning attached by the other and the other had reason to know the meaning attached by the first party.

Based on the findings of the trial court, the instant case falls squarely within the principle stated above. Kraus-Anderson was aware of the ambiguities in the contract and plaintiff was not. Kraus-Anderson accepted plaintiff's bid without informing plaintiff that it expected plaintiff to supply the valves and wall fittings in question. As between these two parties, Kraus-Anderson should bear the burden of its failure to clarify plaintiff's responsibilities. The parties' relationship of prime contractor and subcontractor supports this result: one aspect of a prime contractor's duties is to coordinate the work of its subcontractors and eliminate gaps and overlaps in their work.

Cases cited by the defendant for the proposition that the subcontractor should be responsible for clarifying the scope of his bid can be readily distinguished.[4] In each of them, the subcontractor made an error in calculating its bid or failed to use specified materials in its bid; the subcontractor was himself at fault. By contrast, the contract in the present case was itself ambiguous. The subcontractor did not notice the ambiguity, however, but instead reasonably believed that it was not responsible for providing the items in question.

Therefore, we agree that Lamb, the subcontractor, should be reimbursed for costs incurred in providing the valves and wall fittings, and we affirm the decision of the trial court.

Affirmed.

APPENDIX

SELECTED PROVISIONS OF DIVISIONS 2 AND 15 OF THE CONTRACT SPECIFICATIONS

SECTION 02554

FORCEMAIN CONSTRUCTION

\* \* \* \* \* \*

2. *GENERAL.* This section of the specification covers all items of work and materials for the construction of the 48 inch forcemain within the plant site as shown on the drawings, with the exception of the Excavation and Backfill specified under Section 02210.

3. *SCOPE.* The work included under this section shall include all of the necessary labor, materials, equipment, tools, skills and other facilities required to construct the required forcemain as shown and detailed on the drawings and as specified hereunder.

\* \* \* \* \* \*

6. *VALVES AND OPERATORS.* Two gate valves on the forcemain are located within a valve and cleanout structure adjacent to the tunnel. These valves shall meet all requirements specified for under Section 15120 hereinafter. In addition, each valve shall be equipped with an enclosed gear operator mounted on the valve as shown on the drawings. The geared operators shall be as specified in A.W.W.A. C–500 except that extended type gear cases shall be utilized to permit the repacking of the stuffing box of the gate valve without disassembly. Also valve operating stems shall be extended through the roof slab of the structure and each valve shall be equipped with a cast iron operating stand and right angle geared handwheel or crank. Operators shall be equipped with a valve position indicator.

\* \* \* \* \* \*

9. *SPECIAL CONSTRUCTION AT STRUCTURES.* The buried 48 inch forcemain pipe shall connect to several structures as shown on the drawings. Depending on the type of pipe material used, it shall be the responsibility of the supplier and Contractor to provide and install all necessary special connecting pieces or transition pieces necessary to complete the pipe installation at each of these structures. These connections are as follows:

(a) Connections to meter vault.

(b) Two connections to valve and cleanout structure.

(c) Connection to inlet channel of new Pretreatment Building.

(d) Connection to existing double barrel interceptor.

All pipe and fittings required to carry the forcemain through these structures shall be either ductile iron or special

4. *Janke Constr. Co. v. Vulcan Materials Co.,* 527 F.2d 772 (7th Cir. 1976); *Drennan v. Star Paving Co.,* 51 Cal.2d 409, 333 P.2d 757 (1958); *Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.,* 291 Minn. 113, 190 N.W.2d 71 (1971).

 fabricated steel pipe and fittings conforming to all requirements specified under Section 15110 hereinafter. Ductile iron pipe shall be mortar lined in accordance with A.N.S.I A21.4. Steel pipe shall be cement-mortar lined in accordance with A.W.W.A. C205–71. In each case the final interior dimensions shall match the incoming forcemain pipe system at each structure.

## SECTION 15010

## GENERAL PROVISIONS—MECHANICAL CONSTRUCTION

\* \* \* \* \* \*

2. *SCOPE.* The work under this section and following sub-sections of the specifications consists of all labor, material, tools and skills necessary for the furnishing, installation, testing and adjustment of the various items of mechanical construction required under this contract. Each item shall be furnished complete, and installed as shown on the plans and in accordance with these specifications and the manufacturer's recommendations and instructions. In general, the mechanical construction included covers all process equipment and piping, plumbing, heating and ventilation systems.

The omission of any reference to parts necessary or incidental to a complete installation shall not be construed as releasing the Contractor from furnishing such parts.

\* \* \* \* \* \*

## SECTION 15111

## MISCELLANEOUS PIPING ITEMS

\* \* \* \* \* \*

7. *FABRICATED STEEL PIPE.* Furnish and install special fabricated steel pipe sections and fittings as shown on the drawings and as follows:

(a) Inlet and outlet wall pipe sections for the four 72 inch magnetic flow meters.

(b) Pipe and fittings for the interior sections of the 48 inch forcemain (as an alternate option to the use of 48 inch ductile iron pipe and fittings).

## SECTION 15120

## VALVES AND OPERATORS

\* \* \* \* \* \*

2. *SCOPE.* Furnish, install and adjust for proper operation all valves and related operating devices shown on the drawings and schedules and required by the specifications.

\* \* \* \* \* \*

*GATE VALVES.* Gate valves and operators shall be as shown on the plans and schedules and shall conform to the following specifications:

Gate valves 3 inches and larger shall conform to AWWA Specification C500 and shall be double disc type with outside screw and yoke.

Unless otherwise scheduled or specified, gate valves shall be designed for a working pressure of not less than 150 pounds.

Valves shall take full test pressure on either face. Valves shall be from not more than two manufacturers and similar sizes shall be identical and parts interchangeable. They shall be constructed with bolted bonnets provided with stuffing boxes having bolted followers. The stuffing boxes shall be easily accessible and shall be packed ready for use.

Iron body valves 3 inches and larger shall have fittings of Grade A Bronze, except peened or rolled-in gate rings, which shall be Grade B Bronze.

Rubbing surfaces and surfaces in contact during the seating operations, including wedge, wedge seats, thrust ring seats top and bottom stem guide bearing surfaces, packing gland surfaces and contact seats provided for packing

under pressure, shall be all bronze, bronze bushed or bronze faced.

Stems for valves 3 inches and larger shall be cast forged or rolled bronze conforming to AWWA C500. Cast stems shall be of Grade D bronze. Bronze for forged and rolled stems shall be Grade C.

Valves 6 inches and larger, when installed on sewage or sludge lines, shall be provided with suitable cleanouts of approved type in or near the base of the body for removal of sediment.

Gate valves for liquid service shall be designed for 150 pound working pressure and shall be similar in design, construction and materials to Crane Co. No. 483, Mueller Co. No. A–2483–6, M & H Valve Co. Figure No. 68F, or equal.

Gate valves for steam piping shall be designed for a 125 psi working pressure and shall be equal to Crane No. 464½ or 465½, Nibco Scott equivalent or equal.

Gate valves shall be furnished with standard handwheels or chain wheels as shown on the plans, schedules and/or specified. Gate valves installed in an upright position, with handwheels over 5 feet 6 inches above the floor shall be equipped with bevel gears and outside packed gear cases and handwheels.

Gears shall be steel with cut teeth and shall be enclosed in watertight, cast iron gear case of the outside packed stuffing box type, equipped with provisions for lubrication of all moving parts.

Valve operating stems on the 48 inch forcemain valves shall be extended through the roof slab of the structure and each valve shall be equipped with a cast iron operating stand and right angle geared handwheel or crank. Operators shall be equipped with a valve position indicator.

Gate valves of 2½ inch size and smaller for air and water service shall be designed for a working pressure of not less the 125 pounds. They shall be bronze, rising stem, double disc, parallel seat, screwed bonnet type. Valves shall be similar in design, construction and materials to Crane No. 440, or Nibco No. T–112 or equal, with appropriate end connections.

Quick opening gate valves for the sampling system and conveyor spray water system shall be of the lever operated, cam action, solid wedge type with screwed or bolted cap. Valves shall be Crane No. 432, Nibco equivalent, or equal.

Small gate valves for the hydraulic power systems shall be designed for a working pressure of not less than 3000 pounds. They shall be bronze, solid wedge, screwed bonnet type with non-rising stems. Valves shall be similar in design, construction and materials to Powell Fig. 1183, Crane equivalent or equal.

AMDAHL, J., not having been a member of this court at the time of argument and submission, took no part in the consideration or decision of this case.