**A.A. METCALF MOVING & STORAGE CO., INC., Respondent,**

v.

**NORTH ST. PAUL–MAPLEWOOD–OAK-DALE SCHOOLS, a/k/a Independent School District No. 622, Appellant.**

No. C5–98–1308.

Court of Appeals of Minnesota.

Dec. 29, 1998.

---

John D. McKenzie, St. Paul, MN (for respondent).

Karen P. Kepple, White Bear Lake, MN (for appellant).

Considered and decided by
KALITOWSKI, Presiding Judge,
SHUMAKER, Judge, and HOLTAN, Judge.

## OPINION

HARVEY A. HOLTAN, Judge.*

Appellant challenges the district court's finding that Minnesota tariff-rate schedules govern the disposition in this case. Because the district court incorrectly interpreted both (1) whether federal law preempted state motor carrier tariff schedules, and (2) the terms of the parties' carrier contract, we reverse.

## FACTS

In 1996, while preparing to move into a new building one block away, appellant, Independent School District No. 622, contacted three professional moving companies, includ-

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. Art. VI, § 10.

ing respondent A.A. Metcalf Moving & Storage Company, to solicit quotes for the cost of moving the school's property. The range in bids was considerable; respondent bid $19,854, in contrast to two other bids of $59,880 and $83,972. In response to the disparity, an employee of appellant contacted respondent to discuss its bid. In the district court, respondent acknowledged this conversation, in which respondent had affirmed that it was "comfortable" with the bid.

Prior to the move, the parties exchanged correspondence and discussed the terms of the agreement and dates. In January 1997, appellant issued a purchase order for respondent's services, including a reference to respondent's bid. The parties discussed the move in person and by telephone approximately five times during the next six months. No changes to the pricing agreement were ever discussed.

At the end of the first day of the move, June 9, 1997, one of respondent's employees presented a bill of lading which was signed by one of appellant's employees. The bill included a $20,000 estimate on the front page. But the bill also included terms and conditions at the bottom of the first page explaining that "[s]hipment is subject to all rules, regulations, rates and charges in lawfully applicable tariff filed with the Minnesota Department of Transportation." The move continued. On June 26, 1997, respondent presented to appellant an invoice for $16,686, which appellant paid. Appellant had requested an invoice before its fiscal year end on June 30. After the move was completed, respondent presented a second invoice for $49,159. Appellant paid $3,168, the remaining amount of the original bid of $19,854.

Respondent sued appellant for breach of contract damages of $45,991, which represented the unpaid portion of the second invoice. In response to the parties' cross-motions for summary judgment, the district court ordered appellant to pay the $45,991, plus prejudgment interest, costs, and disbursements.

## ISSUES

I. Does the Federal Interstate Commerce Commission (ICC) Termination Act of 1995 preempt Minnesota intrastate motor carrier tariff regulations?

II. If federal preemption applies, did the parties come to a price agreement so as to create a binding contract?

## ANALYSIS

 On appeal from summary judgment, a reviewing court must determine whether the district court erred in its application of the law and whether there are any genuine issues of material fact. *W.V. Nelson Constr. Co. v. City of Lindstrom*, 565 N.W.2d 434, 435 (Minn.App.1997) (citing *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990)). In so doing, a reviewing court views "the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993). Nonetheless, this court is not bound by a district court's decision on a question of law. *Nelson*, 565 N.W.2d at 435 (citing *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984)).

Under Minnesota law, motor carriers must file with the Department of Transportation tariff rate schedules with which they must comply under Minn.Stat. § 221.171, subd. 1 (1996). Subdivision 1 states that:

> No permit carrier shall charge or receive a greater, lesser, or different compensation for the transportation of persons or property or for related service, than the rates and charges named in the carrier's schedule on file and in effect with the commissioner * * * nor shall a permit carrier refund or remit in any manner or by any device, directly or indirectly, the rates and charges required to be collected by the carrier under the carrier's schedules or under the rates, if any, fixed by the board.

*Id.* Finding that a motor carrier cannot deviate from its previously filed rate schedule, the district court ruled that respondent's fixed carrier rate schedule determined the compensation owed for services and the original bid was not controlling.

The district court rejected appellant's contention that the ICC Termination Act preempted Minnesota's tariff rate schedules. The relevant portion of the act reads as follows:

> [A] State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C.A § 14501(c)(1) (1997). Despite this mandatory prohibition of carrier rate schedules, an exception exists for the transportation of "household goods." *Id.* at (c)(2)(B) (1997). If the "household goods" exception applies, the carrier may seek to enforce scheduled rates.

The district court stated that the application of section 14501(c)(1) rested on the definition of "household goods." Neither the parties nor the court found a statutory definition for "household goods" which applied to section 14501(c)(1). As a result, the parties debated the application of the Federal Highway Administration's definition of "household goods," under U.S. Department of Transportation regulations, found at 49 C.F.R. § 375.1(b)(1) (1997).[1]

The court rejected the Federal Highway Administration's definition of "household goods" and instead relied on a Minnesota definition of the term. The court rejected the federal definition because it explicitly applied only to interstate or foreign commerce. The court ruled that this explicit reference to interstate or foreign commerce did not support a finding of implied federal preemption of intrastate carrier rates.

In further pursuit of a definition, the court turned to Minn.Stat. § 221.011, subd. 23 (1996), which defines "household goods."

> [P]ersonal effects and property used or to be used by the owner in the owner's dwelling; furniture, fixtures, equipment and property of business places and institutions, public or private, when a part of the stock, equipment, supplies or property of such establishments.

*Id.* The court ruled that the school property moved by respondent fell under this definition. As a result, the court ruled that the "household goods" exception in the ICC Termination Act prevented federal preemption of state regulated intrastate carrier rate schedules. The court based its order for payment on respondent's tariff rates filed with the state under Minn.Stat. § 221.171, subd. 1.

### I.

Appellant argues that 49 U.S.C.A. § 14501(c) preempts state tariff regulations of motor carriers. "Questions of statutory construction are questions of law and are fully reviewable by an appellate court." *Metropolitan Sports Facilities Comm'n v. County of Hennepin,* 561 N.W.2d 513, 515 (Minn. 1997). The court of appeals reviews an interpretation of the law de novo. *Winkler v. Magnuson,* 539 N.W.2d 821, 825 (Minn.App. 1995), *review denied* (Minn. Feb. 13, 1996).

Under the U.S. Constitution's Supremacy Clause, "the Laws of the United States * * * shall be the supreme Law of the Land * * * any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution" are invalid. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824). "The ways in which federal law may pre-empt state law are well established and in the first instance turn on congressional intent." *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (citation omitted). But the "'historic police powers of the [s]tates' are not to be eclipsed unless to do so was 'the clear and manifest purpose of Congress.'" *Dahl v. Charles Schwab & Co.,* 545 N.W.2d 918, 922 (Minn.1996) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230,

---

1. The court and parties mistakenly cited to 49 C.F.R. § 1056.1(b)(1) (1996), which was redesignated 49 C.F.R. § 375.(b)(1). 61 Fed.Reg. 54707 (1996).

67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)), *cert. denied,* —— U.S. ——, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996).

The district court found that Congress did not expressly intend to preempt state law, basing this finding on the perceived lack of a federal definition of "household goods." Furthermore, the district court rejected an implicit preemption of state rate schedules. The court looked to *Schlotz v. Hyundai Motor Co.,* 557 N.W.2d 613 (Minn.App.1997), *review denied* (Minn. Mar. 26, 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 80, 139 L.Ed.2d 38 (1997), to determine whether Congress implied a preemption of the state regulation: "[s]tate regulation will be impliedly preempted if: (1) Congress has entirely displaced the possibility of state regulation; or (2) state regulations conflict with federal law." *Id.* at 615 (citations omitted.) The court decided that Congress did not implicitly intend to preempt state law. *See Dahl,* 545 N.W.2d at 924 (providing four main considerations as a test to determine whether Congress has implied federal preemption of a state regulation).

■ Unfortunately, the district court and the parties overlooked the explicit intent of Congress and the statutory definition of "household goods" found in the ICC Termination Act. "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990). Based on our examination of the statutory language and purpose, we conclude that Congress intended to preempt state regulation of intrastate moves of "household goods."

The language of the ICC Termination Act demonstrates an express intent to abolish rate schedules, except under particular and enumerated circumstances. The first expression of Congressional intent is the chosen name of section 14501—"Federal authority over intrastate transportation." Section 14501(c)(1) expressly prohibits state motor carrier price regulation. The only exception applicable to this case is the exception for "household goods," set forth in section 14501(c)(2)(B).

Congress defined "household goods" at 49 U.S.C.A. § 13102(10) (1997). Section 13102(10) provides that " 'household goods,' as used in connection with transportation, means personal effects and property used or to be used in a dwelling, when a part of the equipment or supply of such dwelling." Congress further defined "transportation" to include "services related to * * * arranging for, receipt, delivery, elevation, transfer in transit, refrigeration * * * storage, handling, packing, unpacking, and interchange of passengers and property." 49 U.S.C.A. § 13102(19) (1997).

Any further doubt as to the express intent of Congress will be removed by a reading of the act's legislative history. Sections 14501 and 13102 were recodified from previous acts into the ICC Termination Act, passed by Congress in 1995, which was intended to "substantially deregulate[ ] the rail and motor carrier industries." H.R.Rep. No. 104–311, at 82 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 793. In describing the definitions section, the report noted that "[r]evisions have been made to the definition of household goods to deregulate office and trade show moves." *Id.* at 199, *reprinted in* 1995 U.S.C.C.A.N. at 884. Finally, in relation to federal authority of intrastate transportation, the House report establishes that section 14501 was intended to preserve "existing prohibitions against intrastate regulation of * * * trucking prices." *Id.* at 218, *reprinted in* 1995 U.S.C.C.A.N. at 903.

Both the express language in section 14501 prohibiting intrastate regulations and the legislative history of the act demonstrate that Congress clearly intended to deregulate intrastate carrier prices and to eliminate state rate schedules. The federal act provides a more focused and applicable definition of "household goods" than that applied by the district court in this case. The federal definition excludes all but the transportation of certain goods from a dwelling—not a business or institution, public or private. *Compare* Minn.Stat. § 221.011, subd. 23, *with* 49 U.S.C.A. § 13102(10).

■ The next issue is whether Congress intended that the move of school property

constitute the transport of "household goods." "[T]he Constitution invests the Judiciary, not the Legislature, with the final power to construe the law." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581 (1992). While the act fails to define the term "dwelling," the legislative history illustrates that the act was specifically designed to eliminate the regulation of office moves. *See* H.R.Rep. No. 104–422, at 199, *reprinted in* 1995 U.S.C.C.A.N. at 884. This move of an entire school is analogous to an office move and not to the move of "personal effects and property" used in a "dwelling." *See* 49 U.S.C.A. § 13102(10). Moreover, "[u]nder the supremacy clause of the federal constitution, federal law preempts conflicting state law." *MNVA R.R., Inc. v. John Alden Life Ins. Co.*, 507 N.W.2d 15, 17 (Minn.App.1993) (citation omitted). Because application of the Minnesota definition of "household goods" results in creation of an impermissible conflict with the express federal intent to further deregulate the motor carrier industry and abolish carrier rate schedules, federal law preempts the enforcement of state-approved rate schedules for the move.

Because we find that federal law preempts Minnesota tariff rate schedules, it is unnecessary to respond to appellant's arguments regarding (1) the relevance of the mandatory bidding process under Minn.Stat. §§ 123.37 (1996) and 471.345 (1996), and (2) appellant's affirmative defense under Minn. R. 7800.2000 (1997).

## II.

■ Our finding that federal law preempts enforcement of Minnesota's carrier rate schedules leads this court to review the existence of a contract between the two parties. Generally, a reviewing court may consider only issues presented to and considered by the trial court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988). Nevertheless, the "construction and effect of a contract are questions of law for the court." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979).

■ The supreme court has explained that "[t]he cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." *Art Goebel, Inc. v. North Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn.1997) (citation omitted). When interpreting a contract, "the language found in a contract is to be given its plain and ordinary meaning." *Turner*, 276 N.W.2d at 67 (citations omitted).

■ The parties' pre-move agreement and the bill of lading are persuasive evidence as to the existence of a contract. In determining the existence of a contract, a party's "outward manifestation of assent is determinative, rather than a party's subjective intention." *Speckel by Speckel v. Perkins*, 364 N.W.2d 890, 893 (Minn.App.1985); *see also Cederstrand v. Lutheran Bhd.*, 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962) ("Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively.").

The parties agree that respondent initially bid that moving the school's property would cost $19,854. Respondent has contended that this was nothing more than a simple estimate, on which appellant should not have relied. But then on what should appellant have relied? Judging respondent's "expression" of willingness to perform the move for the stated amount "objectively," we can see no basis for disregarding that outward manifestation of assent to the contract. At no point prior to the move did respondent retract this manifestation of assent to the contract, and there is no evidence that appellant "took advantage" of respondent in relying on that assent.

■ However, we need not rely entirely on the parties' accepted bid of respondent, because we have the bill of lading signed by both parties. A bill of lading is a basic transportation contract and its terms and conditions bind the shipper and carrier. *Bankruptcy Estate of United Shipping Co. v. Tucker Co.*, 474 N.W.2d 835, 840–41 (Minn. App.1991) (citing *Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982)), *review denied* (Minn. Oct. 31, 1991). Obligations arising under a bill of lading " 'are

measured by its terms.'" *Carbic Mfg. Co. v. Western Express Co.*, 149 Minn. 467, 469, 184 N.W. 35, 35 (1921) (citation omitted).

The parties agree that the bill of lading constitutes a contract. The price term specified in the bill of lading is $20,000. Because the parties have not addressed the de minimis difference between the amounts specified in the bid and the bill of lading, we do not. We conclude that the bill of lading demonstrates the parties' intent to contract and to be bound by those terms.

 In the district court, respondent argued that it was entitled to the reasonable value of services and materials provided under quasi-contract principles or quantum meruit. Respondent did not brief this argument to this court and did not request a remand for the district court to address these alternative theories. *See Hoyt Inv. Co. v. Bloomington Commerce & Trade Ctr. Assocs.*, 418 N.W.2d 173, 175–76 (Minn.1988) (respondent who fails to seek remand is barred from asserting alternative arguments in the district court after reversal on appeal); *see also Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn.1982) (issues not briefed on appeal are waived).

 Even if these issues were properly presented, we conclude that respondent is not entitled to relief. In support of its argument, respondent cites *Olsen v. Independent & Consol. Sch. Dist. No. 50*, 175 Minn. 201, 201, 220 N.W. 606, 606 (1928), which explained that a school district has a "quasi contractual obligation * * * to pay the reasonable value of any benefits which it receives in the transaction." Yet, in so relying, respondent overlooks crucial factual distinctions: the school district in *Olsen* had restrained plaintiff's performance of the contract. 175 Minn. at 205, 220 N.W. at 607. There is no evidence in this case that appellant restrained respondent in performance, caused respondent to incur extra costs, or

caused respondent to make an erroneous bid as to the moving costs.

 Respondent contends that appellant is seeking to take advantage of respondent's first offer. Respondent argues that appellant should have been aware that the bid was a mistake, based on the other two much higher solicited bids. "An offeree 'will not be permitted to snap up an offer that is too good to be true; no agreement based on such an offer can * * * be enforced by the acceptor.'" *Speckel*, 364 N.W.2d at 893 (quoting 1 *Williston on Contracts* § 94 (3d ed.1957)). But a party's "unilateral mistake in entering a contract is not a basis for rescission unless there is ambiguity, fraud, misrepresentation, or where the contract may be rescinded without prejudice to the other party." *Id.* at 893 (citation omitted).

We are not persuaded by respondent's argument. Respondent has failed to establish that it should be entitled to relief from a contract based on its offer. Furthermore, respondent is attempting to impose far too much responsibility in the bidding process upon appellant. Respondent is a professional moving company, and it is only natural that the school board relied on its estimated cost of the move.[2] Appellant should not be expected to be experienced in matters of moving costs—that is why it dealt with respondent in the first place.

Moreover, there is no evidence that appellant behaved or acted in any way to mislead or take advantage of respondent. In fact, an employee of appellant made further inquiry into respondent's bid and confirmed respondent's confidence in that bid. Respondent cannot now ask that the courts provide a remedy for respondent's unilateral mistake.[3] Respondent won the informal bidding process, and it will find no refuge to escape from its contract with the school.

---

**2.** *Cf. Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.*, 291 Minn. 113, 116–20, 190 N.W.2d 71, 73–76 (1971) (ruling that under principles of promissory estoppel, detrimental reliance and acceptance of a bid creates a contract, and explaining that a loss resulting from carelessness falls upon the party guilty of the error) (citations omitted).

**3.** We note that respondent's total charge for the move is $69,013, which is three and a half times the amount of its bid. This unexplained disparity by professional movers questions the good faith and claimed error of the bidder.

## DECISION

Accordingly, we reverse the district court. Federal law preempts Minnesota's scheduled rate tariffs. The $20,000 quote enumerated in the bill of lading reflects the final intent of the parties as to price. Respondent is entitled to recover $146, which is the difference between what appellant paid ($19,854) and that price.

**Reversed.**

KALITOWSKI, Judge (concurring in part, dissenting in part)

I concur with the determination that under these facts the state motor carrier tariff schedules are preempted by federal law. Because the district court found the state tariffs were controlling, it did not address issues raised regarding the existence and terms of a contract between the parties. Therefore, I respectfully dissent from the decision to address these issues rather than remand them for initial consideration by the district court. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (reviewing court will generally only consider matters presented and considered by district court).