**FIRST BANK (N.A.) ST. CLOUD, Respondent,**

v.

**COMMUNITY STATE BANK OF PRINCETON, Appellant.**

No. C6–85–1558.

Court of Appeals of Minnesota.

April 22, 1986.

John C. Thomas, Catherine A. Cella, Lucinda E. Jesson, Minneapolis, for respondent.

John G. Engberg, Mark W. Bay, Scott A. Higbee, Minneapolis, for appellant.

Heard, considered and decided by NIERENGARTEN, P.J., and LESLIE and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Community State Bank of Princeton (Community) appeals from a judgment granting First Bank St. Cloud's (First Bank) motion for summary judgment. We reverse and remand for trial on the merits.

## FACTS

This case involves competing claims to funds of Dickenson Lines, Inc. (DLI) deposited at Community in which First Bank had a higher priority security interest. DLI, a company which is now undergoing a Chapter 7 liquidation in bankruptcy, was engaged in the business of refurbishing buses for municipalities.

On August 19, 1982, First Bank and DLI entered into a financing agreement by which First Bank agreed to provide operating loans to DLI, thereby becoming DLI's principal financing institution. First Bank's loan was secured by security agreements granting it a security interest in all of DLI's accounts receivable, equipment, inventory and contract rights owned or thereafter acquired. In short, the operating loan was secured by a blanket security interest in all of DLI's assets. First Bank properly perfected its security interest.

First Bank restructured the loan on December 13, 1982 to provide DLI a line of credit to finance the purchase of inventory and work in progress and to carry accounts receivable. Under the new terms, First Bank was to provide a line of credit up to $1.5 million. The base for the line of credit consisted of eighty percent of accounts receivable aged no more than sixty days and sixty percent of new and remanufactured parts. DLI was to be permitted credit up to these amounts. The loan agreement further prohibited DLI from taking out additional loans from other lenders without the written consent of First Bank.

An additional condition of the loan required DLI to hire Collateral Control Corporation in St. Paul to verify its borrowing base. In order to verify the borrowing

base, DLI prepared reports establishing the status of its accounts receivable and inventory and submitted these reports to Collateral Control Corporation for verification. The corporation then supplied reports to First Bank. An officer from First Bank testified that it was essential to accurately ascertain the amount of accounts receivable because DLI's credit was limited to eighty percent of current accounts receivable, and if the amount were overstated, the borrowing base would be inflated and First Bank would be undersecured.

In June 1983, First Bank became concerned about DLI's alleged violation of the loan agreement. Specifically, in a letter to DLI's parent company, First Bank cited DLI for failing to furnish a borrowing base verification, failing to provide proof of insurance, and incurring additional debt. The letter demanded immediate payment or the establishment of further "credit controls." Under the credit control option, which DLI elected, DLI was now to provide borrowing base verification on a *weekly* basis rather than monthly basis, and the verification certificate was to contain "a list of all receivables by name, amount and address." As an additional condition, all DLI invoices and payments were to be directed to a post office box under the exclusive control of First Bank. First Bank was to apply the receipts to DLI's operating loan to reduce the principal balance. After the loan was reduced, First Bank then agreed to advance new funds up to the credit limit determined by the previously agreed eighty percent of the accounts receivable and sixty percent of inventory.

Shortly after the establishment of the additional credit controls, First Bank informed DLI that it sought to end the banking relationship. DLI's financial condition did not improve, and by August 1983, DLI exhausted its credit limit. On August 16, 1983, DLI requested First Bank's permission to borrow money from Community in order to meet its payroll obligations.

First Bank agreed to subordinate its security interest in some of the collateral if Community agreed to make the loan to DLI. The agreement benefited First Bank as it allowed DLI to remain in business without the advancement of additional funds by First Bank. On August 16, 1983, First Bank sent a letter agreeing to subordinate its security interest in eight specified receivables that DLI was to receive from the City of San Francisco. First Bank did not release or subordinate any other portion of its security agreement. First Bank's subordination letter stated:

First Bank-St. Cloud acknowledges that Dickenson Lines, Inc. has arranged loans with the Community State Bank of Princeton which will be repaid with the [eight specified] invoices. We agreed to release these funds to Dickenson Lines, Inc. for that purpose. Dickenson Lines must inform us when those funds are received. The Bank takes no responsibility for identifying them. In the event our operation loan has been repaid and our present collateral arrangement is not in effect, we can offer no assurances they will be directed to the Community State Bank.

On August 17, 1983, Community loaned DLI $70,000.

The vice-president of First Bank, Paul Barton, testified that at the same time he signed the subordination agreement, he instructed DLI to exclude the eight specified invoices subordinated by the agreement from its reports to Collateral Control Corporation. Barton explained that he gave such an instruction because he did not want First Bank's borrowing base computed using invoice funds earmarked to be used elsewhere. An August 17th note in Barton's credit file comment sheet reflects this instruction. Still concerned that the borrowing base would be inflated by the inclusion of the eight invoices, Barton called DLI to confirm that the eight invoices had been removed from the reports to Collateral Control. Upon receiving the confirmation from DLI, Barton testified that he noted on the Collateral Control report dated August 19, 1983, that "[t]he invoices for Community State Bank are not on here." In the ensuing months, First Bank contin-

ued to receive invoices and payments under the earlier established credit control system. First Bank also received the weekly reports from Collateral Control Corporation verifying DLI's borrowing base. Barton testified at his deposition that he did not watch for any particular invoices as they were received by the bank, and did not check the reports to see which invoices had in fact been received.

In October 1983, First Bank received the eight specified invoices from San Francisco in which it had subordinated its security interest. The weekly collateral control report of October 7, 1983, stated these invoices were received. Barton testified that although he had access to the payments and invoices the bank received, as well as the weekly reports, he claimed he was not aware that First Bank had cleared the San Francisco invoices by crediting them to its loan to DLI and readvancing new funds until much later when the bank was served with a request for production of documents. DLI never directly informed First Bank of the receipt of the eight invoices, but did list them on the weekly collateral control report mailed to the St. Cloud post office box. DLI received the proceeds from the eight invoices through the collateral control system. DLI did not direct the proceeds to Community. DLI received no instructions from First Bank on dispersing the San Francisco funds to Community or otherwise handling them.

From October 1983 to May 1984, DLI continued to represent to Community that it had not yet collected the funds from the eight invoices. DLI assured Community it would repay the loan as soon as the funds were collected. Initially, DLI's loan repayment to Community was due on October 17, 1983, but the repayment date was later set for January 30, 1984, because DLI continued to state it had not received the eight specified invoices.

On May 2, 1984, First Bank demanded payment due under its loan to DLI because of DLI's default under the loan agreement. After this demand, DLI deposited the proceeds of all accounts receivable with Community. DLI's loan balance with Community was $70,455.19 on June 18, 1984, and on that day Community offset that amount against DLI's funds on deposit at Community. Community admits that it offset funds in which First Bank had a perfected prior security interest; Community Bank contends, however, that at the time it offset the funds on deposit, it did not have actual knowledge of the source of the funds.

First Bank moved the trial court for summary judgment on March 19, 1985, contending that a secured party's rights in funds in a debtor's bank account are superior to a depository bank's right of set-off. Community moved to amend its answer and assert a counterclaim. In its amended answer, Community requested relief based on First Bank's alleged conversion of funds in October 1983 in which Community had a superior security interest. Community also claimed it had a right to offset funds on deposit. Community's argument before the trial court was that the subordination agreement imposed a duty on First Bank to assure that the proceeds from the eight specified invoices were directed to Community, and that First Bank failed to do so.

The trial court granted First Bank's motion for summary judgment. The trial court first determined that under *State Bank of Rose Creek v. First Bank of Austin,* 320 N.W.2d 723 (Minn.1982), priority disputes involving a bank's right to offset against its depositor's funds are taken out of the Uniform Commercial Code by section 336.9–104(i) (1984) of Minnesota Statutes, which provides that article 9 of the Uniform Commercial Code does not apply "to any right of set-off." The trial court held, therefore, that First Bank's priority was governed by non-code law. The court noted that as a general rule, banks have a right of set-off against funds on deposit, unless a bank knows of a third-party's interests in the deposits. Here, the trial court found that Community had constructive knowledge of First Bank's interest in the DLI account by virtue of the subordination agreement. Accordingly, the trial

court held that Community's right of set-off was subject to First Bank's security interest. Finally, with respect to Community's counterclaim for conversion or recoupment, the trial court held that the subordination agreement was not ambiguous, and that First Bank did not violate the agreement because it was incumbent upon DLI to identify the eight San Francisco invoices. Community appeals the trial court's summary judgment.

## ISSUE

Was First Bank entitled to summary judgment as a matter of law?

## ANALYSIS

■ The function of a court reviewing summary judgment is to determine whether there are any genuine issues of material fact, and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). Facts must be viewed in the light most favorable to the losing party. *Twin City Construction Co. v. ITT Industrial Credit Co.*, 358 N.W.2d 716, 718 (Minn.Ct.App.1984). In interpreting a contract, "[t]he initial question of whether a contract is ambiguous is a question of law to be decided by the trial court, and therefore this court on appeal is not bound by the trial court's determination." *Lamb Plumbing & Heating Co. v. Kraus-Anderson of Minneapolis, Inc.*, 296 N.W.2d 859, 862 (Minn.1980).

Community makes three arguments on appeal. First, that "[u]nder the terms of the subordination agreement the St. Cloud Bank was clearly under a duty to direct payment of the proceeds of the enumerated invoices to the Community Bank." Community interprets the subordination agreement to mean that First Bank would direct the proceeds from the eight specified invoices to Community so long as DLI's loan with First Bank remained unpaid and the collateral control system remained in effect. Community focuses on the final sentence of the agreement, which provided that "[i]n the event [First Bank's] operat-

ing loan has been repaid and [the] present collateral control arrangement is not in effect, [First Bank offers] no assurances [the invoice proceeds] will be directed to the Community State Bank." According to Community, the other sentences of the agreement precluding First Bank from assuring payment to Community would be unnecessary if First Bank offered no assurances of payment.

Community asserts that the trial court did not construe the subordination agreement in its entirety and failed to give force to all of the language because it ignored the last sentence of the subordination agreement. *See Youngers v. Schafer*, 196 Minn. 147, 150, 264 N.W. 794, 796 (1936). In construing the third and fourth sentences of the agreement whereby DLI was required to inform First Bank when the funds from the enumerated invoices were received, and whereby First Bank expressly stated that it took no responsibility for identifying the invoices, Community asserts that these sentences are consistent with the last sentence, and that DLI satisfied its burden of notice because First Bank had *actual* notice through the receipt of the invoices and the weekly collateral report. The parties agree that a weekly collateral report from DLI to First Bank listed the eight San Francisco invoices.

Community's second major argument is that at a minimum the subordination agreement is ambiguous, and, therefore, summary judgment was improper. Community maintains that the agreement contains three inconsistencies. First, interpreting the provision in the agreement which provides that the purpose of the release of funds was to repay Community in a light most favorable to Community leads to the conclusion that the agreement imposed a duty on First Bank to see that such a purpose was fulfilled. Second, interpreting the third and fourth sentences in Community's favor suggests that the actual notice to First Bank provided by the receipt of the invoices satisfied the requirements of those two sentences. Third, the final sentence imposed a direct duty on First Bank be-

cause the collateral control arrangement was in effect in October 1983 when First Bank received the funds. Community concludes that by granting summary judgment, the trial court prevented it from clarifying the challenged terms of the agreement.

Community's final argument is that regardless of the effect of the subordination agreement, First Bank converted funds in which Community had a superior security interest. Community argues that because First Bank applied funds for its own use in October 1983, funds which were to be held for Community, Community was justified in compensating for that conversion by setting off funds deposited in June 1984 even though those funds were subject to First Bank's higher priority security interest. Community further asserts that First Bank's application of the proceeds from the eight invoices was the functional equivalent of a set-off, which First Bank was not entitled to do because it had actual knowledge of Community's interest in the funds. In short, Community asserts that First Bank's actions form the basis for its equitable recoupment defense, and that its counterclaim for conversion falls within this defense. Community requests that this court remand this case for further proceedings.

First Bank counters that summary judgment was appropriate because Community stated in its letter brief to the trial court that "there are no material factual disputes concerning the actions of the St. Cloud Bank which form the basis for the Community Bank's conversion claim." Thus, First Bank concludes that while ordinarily all factual issues should be resolved against First Bank, because the parties have agreed there are no issues of fact, the trial court's award of summary judgment should be affirmed unless it is without reasonable support in the evidence. *See T.E. Ibberson Co. v. American & Foreign Insurance Co.*, 346 N.W.2d 659, 661 (Minn. Ct.App.1984). In its reply brief, Community asserts that there are disputes as to material facts, and that it has consistently argued that issues exist pertaining to the formation and interpretation of the subordination agreement as well as the parties' intentions.

First Bank's second argument is that Community's conversion claim must be viewed in light of the subordination agreement because the agreement creates limitations not found at common law. One of the limitations was that First Bank assumed no responsibility for identifying the invoices; First Bank merely agreed to subordinate its security interest in eight specific invoices so that DLI could repay Community.

Third, First Bank contends that the subordination agreement is unambiguous. According to First Bank, reading the agreement as a whole, the trial court properly found that the agreement was not patently ambiguous. First Bank contends that Community improperly focuses on the last phrase of the agreement. First Bank argues that the proper interpretation of the agreement is as follows:

> A careful reading of the subordination agreement shows that [First Bank] agreed to do one, and only one act: it agreed to release the specified funds to [DLI] when [DLI] informed [First Bank] that the funds had been received. As further clarification, Mr. Barton added the sentence that "the Bank takes no responsibility for identifying [the funds]." With these sentences, [First Bank] was absolved from any duty, other than releasing the funds to [DLI] upon identification.

According to First Bank, the last sentence simply provides that if DLI repays the loan and the collateral control agreement is no longer in effect, then First Bank is no longer obligated under the subordination agreement. First Bank claims Community's interpretation renders all of the agreement meaningless except for the last sentence.

Finally, First Bank argues that because DLI never identified the invoices, its duty to release the funds was never triggered. First Bank asserts that the notice contained within the October 7, 1983, collateral

report was not adequate notice because First Bank specifically instructed DLI that those eight invoices should not be contained in the reports establishing DLI's borrowing base. Therefore, according to First Bank, it had no duty to look for identification in report which was not supposed to reflect the invoices. Moreover, First Bank asserts there is no support in the record for Community's contention that Paul Barton's monitoring of the weekly collateral reports was evidence of First Bank's duty to identify and direct the funds to Community. First Bank argues that it was under no duty. The funds were, however, readvanced to DLI, and it was DLI who failed to pay Community.

We find that the trial court erred in granting First Bank summary judgment. While the subordination agreement provided that First Bank was not responsible for identifying the receipt of funds in which it had subordinated its security interest, the agreement also provided that First Bank agreed to release funds to DLI "for that purpose," meaning that First Bank agreed to release the specified funds to DLI for the purpose of repaying Community. At oral argument, both parties agreed that "for that purpose" referred to repaying Community and that DLI informed First Bank in the weekly collateral report that the funds had been received. Thus, a substantial fact question arises as to whether First Bank's release of funds into DLI's account without ensuring that Community would receive the funds breached the subordination agreement.

The subordination agreement is not ambiguous as Community claims. Rather, we find that its written language may have imposed a duty on First Bank which may have been breached. Those questions to be answered by a trier of fact make this issue not subject to summary judgment. Construing the document as a whole, as we must, see *Employers Liability Assurance Corp. v. Morse*, 261 Minn. 259, 264, 111 N.W.2d 620, 624 (1961), we conclude that although First Bank had no active responsibility to identify the funds, once DLI identi-

fied them through the weekly report, First Bank may have breached its written agreement by releasing the funds to DLI without ensuring that Community received them. Accordingly, we reverse and remand so that a finder of fact can determine whether First Bank violated the subordination agreement.

## DECISION

The trial court erred as a matter of law in granting First Bank summary judgment.

We reverse and remand for trial.