JAMES McARDLE AND ANOTHER v. H. F. WILLIAMS AND ANOTHER.[1]

February 8, 1935.

No. 30,150.

[1]Reported in 258 N. W. 818.

Stinchfield, Mackall, Crounse, McNally & Moore and Clyde W. Fiddes, for appellants.

Cox, Weeks & Kuhlman and John R. Bullard, for respondents.

JULIUS J. OLSON, JUSTICE.

Defendants have appealed from a judgment entered pursuant to a verdict rendered for plaintiffs. Their blended motion for judgment notwithstanding or a new trial was denied.

James McArdle and son Linus, plaintiffs, did some plowing upon a farm then owned and occupied by the former but which had been foreclosed by defendants (under a second mortgage owned by them) and bid in by them at the foreclosure sale. The plowing was done before the redemption period had expired. It appears that in 1924 James McArdle being the owner of a half section of land in Waseca county executed a mortgage to the Mutual Benefit Life Insurance Company in the sum of $22,000. The land was appraised at that time at $60,000. When that mortgage matured in 1929 the mortgagor was unable to pay the principal and interest. Defendants, a copartnership operating under the firm name of H. F. Williams & Company, were the local correspondents of the insurance company and were in charge of this particular investment. McArdle was unable to meet certain interest and tax payments thereafter falling due, and as a consequence he later executed the second

mortgage hereinbefore mentioned. During the redemption period McArdle continued to live upon and operate the farm, his son Linus having subleased a part of it from his father. In the fall of 1931, about September 7, and after removing the crops, Mr. McArdle, Sr. went to Minneapolis to defendants' office for the purpose of making some arrangement whereby possession of the farm might be retained after the expiration of the redemption period. Several suggested arrangements were considered but no definite agreement reached. Plaintiff tells his story in this fashion, reference being to the conversation with defendant H. F. Williams:

"I came up to see him about this, whether we would plow the farm or not. He said that we should go ahead and get the farm ready to crop, I could either rent it on share rent or buy the farm back. After they went through the formality of the first mortgage I could perhaps be able to get the farm financed. So I went back and got the farm all ready for crop."

Upon returning home to his farm 150 acres were plowed with tractor. The evidence amply establishes that the plowing was done in good shape and that it was reasonably worth $2.50 per acre. There is no evidence to controvert plaintiffs' proof respecting the value of the plowing done. Sometime later, the time being somewhat uncertain, defendants sent a man down to measure the plowing. Thereafter defendants prepared a form of lease, but this was not found satisfactory by plaintiffs. The cash rent demanded was too high in their estimation. They made certain suggestions in respect of changes and returned the proposed contract to defendants. Nothing came of this. The year for redemption expired, and plaintiffs were ordered off the premises. They vacated the same, and a new tenant was placed in possession. From the new tenant defendants exacted a promise to pay for the plowing in the fall of 1932. This action was brought to recover the reasonable value of the plowing so done upon the claim that a contractual relation came about between plaintiffs and defendants at the time of the September, 1931, meeting and that they were entitled to receive the reasonable value of the plowing so done. The court sub-

mitted the matter to a jury, and a verdict was rendered in favor of plaintiffs for $375. Upon this statement of facts, concerning which there is no substantial dispute, defendants contend that no recovery can be had because in the performance of the work by plaintiffs they had no "intention to charge therefor"; that plaintiffs did the work exclusively for their own benefit and while they were the owners and in possession of the premises. In support of that claim defendants cite 54 A. L. R. 548, 549:

"To render one liable as debtor under an implied promise, it must be shown not only that the services were valuable, but also that they were rendered under such circumstances as to raise the presumption that the parties intended and understood that they were to be paid for, or at least, that the circumstances were such that a reasonable man, in the same situation as that of a person who receives and is benefited by them, would and ought to understand that compensation was to be paid for them."

We are also referred to 28 R. C. L. pp. 670, 671, § 6:

"Assumpsit cannot be based on a spontaneous and unasked service, rendered through kindness or other motive, and not to be accounted for on the theory of an expectation of payment. This is but a corollary of the general principle in the law of contracts, that all contracts must be good or bad in their original creation, and must not depend on subsequent contingencies. Liability for services cannot hinge on whether the party chooses at a future date to make them a gift or a charge."

There can be no dispute respecting the accuracy of the principles stated. But that does not solve the problem. The question is whether this work was done under such circumstances "that a reasonable man, in the same situation" as defendants (benefited thereby), "would and ought to understand that compensation was to be paid." The facts refute, too clearly for successful denial, that plaintiffs were not doing this work as "a spontaneous and unasked service." James McArdle would not make a trip from Waseca county to Minneapolis in the busy fall days to proffer defendants

"spontaneous" service. Plowing 150 acres of heavy black soil to a depth of seven inches is not ordinarily done gratuitously by hard-working and hard-pressed farmers for anyone "through kindness" or other similar motive. James McArdle and his son were fighting to save the "old homestead," the place where the elder McArdle had spent his best years, 44 of them. The overhanging mortgage of more than $20,000, the sheriff's certificate held by defendants, with the time fast approaching when right of redemption would expire, the lingering hope of saving this fine farmstead, compelled him to make this trip in the hope that somehow defendants would extend a helping hand so that if arrangements to refinance the loan could not be accomplished, at least next year's use might be had. That defendants well knew and understood what was sought cannot be doubted. It was to their advantage to get the fall plowing done if redemption were not accomplished. This plowing they could not have done by anyone unless plaintiffs consented. As owner of the fee, Mr. McArdle could effectually keep defendants out of possession during the redemption period. It is not to be supposed that defendants were ignorant of plaintiffs' rights. That is why Mr. Williams told McArdle to "go ahead and get the farm ready to crop" and that "I [McArdle] could either rent it on share rent or buy the farm back." Defendants' subsequent preparation of a farm lease and forwarding same by mail for plaintiffs' signatures affords abundant proof that such arrangement was one of the methods talked of and considered at the September meeting. Instead of a farm lease on a crop-sharing plan, as Mr. McArdle testifies was talked about, the instrument prepared by defendants required a cash rent payment of five dollars per acre. To do this, so plaintiffs claim, was more than they could afford to pay. The changes suggested by plaintiffs were ignored. If such conduct as was here resorted to by defendants were to be successful, then as to plaintiffs law would be an instrumentality of the greatest injustice. Fortunately such is not the law. Defendants' claim that liability *quasi* contract has not been shown to exist may be granted. There is a clear distinction between implied contracts and *quasi* contracts. The distinction has very often been ignored in the cases.

But our cases rather clearly distinguish between the two. The distinction is plainly pointed out in Restatement, Contracts, § 5. The section mentioned and comment thereunder are sufficiently important to be quoted:

"§ 5. Except as stated in § 72(2), a promise in a contract must be stated in such words either oral or written, or must be inferred wholly or partly from such conduct, as justifies the promisee in understanding that the promisor intended to make a promise.

"Comment: a. Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Implied contracts must be distinguished from quasi-contracts, which also have often been called implied contracts or contracts implied in law. Quasi-contracts, unlike true contracts, are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice. Such obligations were ordinarily enforced at common law in the same form of action (assumpsit) that was appropriate to true contracts, and some confusion with reference to the nature of quasi-contracts has been caused thereby."

See also Minnesota Annotations, Pocket Supplement, 1934, Restatement, Contracts, same section. There our cases are cited, and the comment made is valuable and correctly portrays the distinction. In Benedict v. Pfunder, 183 Minn. 396, 400, 237 N. W. 2, 4, the principles involved here came before the court for interpretation and application. The following language therein used seems appropriate here:

" 'Words are not the only medium of expression. Conduct may often convey as clearly as words a promise or an assent to a proposed promise, and where no particular requirement of form is made by the law a condition of the validity or enforceability of a contract, there is no distinction in the effect of a promise whether it is expressed (1) in writing, (2) orally, (3) in acts, or (4) partly in one of these ways and partly in others.' Restatement, Contracts, American Law Institute, § 21.

"The distinction between an express contract and one implied as of fact involves 'no difference in legal effect, but lies merely in the mode of manifesting assent.' *Id.* § 5. It is not the subjective thing known as meeting of the minds, but the objective thing, manifestation of mutual assent, which is essential to the making of a contract. 'Not mutual assent but a manifestation indicating such assent is what the law requires.' *Id.* § 20."

It seems to us that upon the facts stated liability was properly imposed upon defendants.

Affirmed.

