Judith M. OLSON, Petitioner,
Appellant,

v.

SYNERGISTIC TECHNOLOGIES
BUSINESS SYSTEMS, INC.,
et al., Respondents.

Nos. C0–99–769, C8–99–776.

Supreme Court of Minnesota.

June 28, 2001.

Lawrence P. Schaefer, Lisa C. Stratton, Sprenger & Lang, PLLC, Minneapolis, Paul C. Sprenger, Michael Lieder, Sprenger & Lang, PLLC, Washington, D.C., for appellant.

Richard G. Morgan, David S. Miller, Jennifer K. Huelskoetter, Bowman and Brooke, LLP, Minneapolis, for respondents.

Douglas A. Hedin, Elizabeth A. Glidden, Hedin & Goldberg, P.A., Minneapolis, for amicus curiae Minn. Chapter Natl. Employment Lawyers Ass'n.

## OPINION

ANDERSON, PAUL H., Justice.

This case requires us to determine the narrow issues of whether Minn. Const. art. I, § 4 guarantees appellant Judith M. Olson the right to a jury trial on her cause of action based on "promissory estoppel" and whether Minn. R. Civ. P. 38.01 entitles her to a jury trial because she sought a monetary remedy. Olson sued Synergistic Technologies Business Systems, Inc. ("Syntech"), PowerCerv Corporation, and Thomas J. Cameron, asserting 12 different counts, to enforce Cameron's alleged promise to give her an ownership interest in Syntech. Cameron was Syntech's founder and sole shareholder until he sold Syntech to PowerCerv. Before trial, the district court dismissed all counts except the two based on "promissory estoppel" and "equitable estoppel." Olson sought a jury trial on these two remaining counts, but the court denied her request on grounds that both counts were equitable in nature.

After hearing the evidence, the district court found that Olson failed to prove any element of either estoppel count, but the court invoked its equitable powers to award Olson a $60,000 judgment. Olson appealed the grant of partial summary judgment and the denial of her motion for a new trial. The court of appeals affirmed the district court on the two estoppel counts, but reversed the district court's $60,000 judgment. Olson then petitioned this court for review, arguing that she was entitled to a jury trial under the Minnesota Constitution and Minn. R. Civ. P. 38.01. We affirm the court of appeals.

Judith Olson and Thomas Cameron met in 1972. At that time, Cameron was a student at Robbinsdale Armstrong High School, and Olson, who worked at Control Data Corporation as a programmer analyst, was a volunteer math tutor at that

school. The two shared a common interest in computers, visited frequently, developed a friendship, and later became intimately involved. After Olson divorced her husband, Cameron began living with Olson at her home.

Cameron founded Syntech in 1983 with $1,000 of his own money. At the time, Cameron was working full-time at an accounting firm designing and installing computer systems. Olson was still working full-time at Control Data. Cameron operated Syntech as a sole proprietorship and worked out of the basement of Olson's home. Syntech offered programming services and custom software applications for businesses. Cameron did not draw a salary from Syntech; instead, he invested the company's earnings by purchasing additional computer equipment and other business necessities. During this time, he kept the business' cash flow going by taking on computer consulting jobs.

Cameron continued to operate Syntech out of Olson's basement throughout 1983. In 1984, Cameron incorporated Syntech and became its only shareholder. Olson specifically chose to not be involved in the incorporation in order to protect her individual financial assets. At that time, she had no role as an incorporator, shareholder, officer, or employee of Syntech. Between 1984 and 1989, Olson made several loans to Syntech. All loans were repaid. During this time, Olson also made two personal loans to Cameron, and these loans were repaid.

In 1985, Cameron and Olson jointly purchased a home in Plymouth. Cameron transferred Syntech's operations to the basement of the new home, and he paid one-half of the new mortgage payments. In October 1986, Control Data laid off Olson. During this time, Olson—who was concerned that the couple's only source of income was Syntech—began managing Cameron's personal financial affairs. Olson also began to voice opinions and concerns about the financial and administrative "functions" at Syntech. Cameron permitted Olson to become more involved in these functions. At this time, Olson worked without pay and was actively, but unsuccessfully, seeking other employment. At some point thereafter, Olson prepared materials for one of Syntech's investor relations presentations, indicating that Olson was part of Syntech's management team. Olson also created marketing materials that listed her as Syntech's Chief Financial Officer and Director of Operations. Olson testified that she performed "financial, consulting and legal" services for Syntech.

On April 1, 1989, Cameron ended his personal relationship with Olson and began an intimate relationship with another woman. In mid-April, Cameron placed Olson on Syntech's payroll at an annual salary of $60,000, an amount comparable to Cameron's base salary. Cameron testified that when Olson went on Syntech's payroll, there were no discussions about back-pay or an ownership interest in Syntech. Shortly thereafter, Olson assumed the title of Chief Operating Officer even though Cameron testified that he did not give her this title. Cameron continued to live in the Plymouth home until he moved out just after becoming engaged to the other woman in the fall of 1989. Cameron continued to pay Olson for one-half the mortgage, and he did not move Syntech's operations out of the Plymouth home until December 1990.

On November 13, 1989, Olson prepared a handwritten note to herself in which she listed as topics: stock in company, $250,000 life insurance policy, house payment assistance, and one-half of boat charter business. Olson did not give this note to Cameron, but Cameron testified that he

remembered that Olson started discussing those topics shortly after he ended their intimate relationship. Cameron testified that during June 1991, he transferred his ownership interest in the Plymouth home to Olson, which interest Cameron estimated at approximately $30,000 to $40,000. In addition, he transferred his interest in their sailboat charter business to Olson,[1] but he did not transfer a $250,000 insurance policy on his life. He also testified that he did not remember Olson asking for stock in Syntech at that time.

Olson's involvement with Syntech ended in December 1994. On December 5, 1994, Cameron gave Olson a letter in which he stated that she had overstepped her authority, it was becoming more and more difficult to work with her, and she was becoming abrasive with the other employees. Cameron then placed Olson on a 21 day leave of absence. She did not return to work for Syntech, and Cameron formally terminated her employment on January 9, 1995. Cameron testified that at the time he placed Olson on leave, he knew that she believed she deserved an ownership interest in Syntech because, beginning in 1993, Olson repeatedly demanded 50 percent of Syntech's stock. Cameron refused each demand, and at trial he denied promising Olson any ownership interest in Syntech.

In February 1995, PowerCerv expressed an interest in purchasing Syntech's assets. On November 1, 1995, Cameron sold Syntech's assets to PowerCerv. As a result of the sale, Cameron received $2.25 million in cash and 230,000 shares of PowerCerv common stock then valued at $4 per share.

Olson initiated her action against Cameron, Syntech, and PowerCerv on November 22, 1995. Olson's amended complaint consisted of 12 separate counts, which included Count III: Promissory estoppel, and Count IV: Estoppel/unjust enrichment. With respect to these two counts, Olson sought "enforcement of [Cameron's alleged] promises" by way of a "fair share of the value accrued to [Cameron through the sale of Syntech] as a result of her contributions." On January 29, 1998, Cameron filed a motion for summary judgment with respect to all 12 counts, and on March 25, 1998, the district court granted the motion with respect to all counts except the counts for promissory and equitable estoppel.[2] Under these two surviving counts, Olson sought "her fair share of the value accrued to [the] defendants as a result of her contributions."

On March 30, 1998, a bench trial began on the two remaining counts and lasted 12 nonconsecutive days until April 23, 1998. The parties submitted supplemental material to the court until a June 12 deadline, and on September 8, 1998, the court issued findings of fact and an order for judgment, concluding that Olson failed to prove any element of her estoppel counts. However, the court awarded Olson a $60,000 judgment after concluding that if she had not been fired, she would have been entitled to the same "deal" as other employees of her level, which for Olson was a one-year employment contract with PowerCerv at a $60,000 salary. Final judgment was en-

1. The record does not reflect the value of Cameron's ownership interest in the sailboat charter business.

2. The court's order is unclear. The court dismissed counts I, II, III, V, VI, VII, VIII, IX, X, XI, and XII-and left only count IV, the "estoppel/unjust enrichment" count. The court's order stated that the "unjust enrich- ment claim in count 5 is also dismissed. The only remaining claim is for *equitable or promissory estoppel.*" (Emphasis added.) This more specific language indicates that the court dismissed all counts except for promissory and equitable estoppel. Both were argued at trial.

tered on April 20, 1999, and Olson's subsequent motion for a new trial was denied.

Olson appealed the order granting partial summary judgment, the denial of her motion for a new trial, and the final judgment. Olson argued that the district court erred in denying her the right to a jury trial on her estoppel counts, erroneously applied the statute of limitations to the estoppel counts, and misapplied the law with respect to Olson's constructive trust and tortious interference counts. The court of appeals affirmed the district court in part, but held that the facts did not support the court's grant of a $60,000 judgment because Olson was an at-will employee and because the award was inconsistent with the district court's prior rulings. On appeal to our court, Olson argues that under the Minnesota Constitution and Minn. R. Civ. P. 38.01, she is entitled to a jury trial on her counts based on promissory and equitable estoppel.

## I.

■ We are first asked to determine whether the Minnesota Constitution entitles Olson to a jury trial in the cause of action she pleaded in her complaint as Count III "Promissory Estoppel." The district court and the court of appeals held that because the doctrine of promissory estoppel is equitable in nature and the Minnesota Constitution guarantees the right to a jury trial only in legal actions, our Constitution does not guarantee Olson a jury trial. We review a lower court's interpretation and application of the Minnesota Constitution de novo. *See State v. Wicklund*, 589 N.W.2d 793, 797 (Minn. 1999).

■ The Minnesota Constitution provides that "[t]he right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy." Minn. Const. art. I, § 4.

One of the first cases to interpret this clause was *Whallon v. Bancroft*, 4 Minn. 109 (Gil.70) (1860). In *Whallon*, we held that the effect of this clause is:

[F]irst, to recognize the right of a trial by jury as it existed in the Territory of Minnesota at the time of the adoption of the state constitution; and second, to continue such right unimpaired and inviolate. It neither takes from or adds to the right as it previously existed, but adopts it unchanged. Wherever the right of trial by jury could be had under the territorial laws, it may now be had, and the legislature cannot abridge it; and those cases which were triable by the court without the intervention of a jury may still be so tried.

*Id.* at 111 (Gil. at 74); *see also Jordan v. White*, 20 Minn. 91 (Gil.77) (1874) (holding that although the pleadings stated a cause of action entirely equitable in nature and therefore necessitated only a bench trial, the trial court did not abuse its discretion in submitting specific fact questions to the jury).

We applied *Whallon* in *Schmidt v. Schmidt* to determine whether a party had a constitutional right to a jury trial in a proceeding to determine the validity of a will offered for probate. 47 Minn. 451, 453, 50 N.W. 598, 599 (1891). In *Schmidt*, we held that even though it was common practice for a jury to determine the validity of a will offered for probate, the relevant probate statute did not provide for a jury trial. *Id.* at 453–55, 50 N.W. at 599–600. To resolve the right-to-jury-trial issue, we first reiterated our holding in *Whallon* that the Minnesota Constitution preserved the right to a jury trial as it existed at the time our Constitution was adopted. *Schmidt*, 47 Minn. at 453, 50 N.W. at 599. We then held that because the laws of the Minnesota Territory permitted but did not require a jury trial to

determine the validity of a will, the Minnesota Constitution did not guarantee Schmidt the right to a jury trial. *Schmidt,* 47 Minn. at 456, 50 N.W. at 600; *see also Lommen v. Minneapolis Gaslight Co.,* 65 Minn. 196, 209, 68 N.W. 53, 54–55 (1896) (holding that a party would be entitled to a jury trial if she would have been "entitled to jury trial by the laws of the [Minnesota] territory at the time of the adoption of the [Minnesota] constitution"); *e.g., Riley v. Chicago, Milwaukee & St. Paul Ry. Co.,* 67 Minn. 165, 167, 69 N.W. 718, 719 (1897); *State ex rel. Styve v. Kinsley,* 85 Minn. 215, 218, 88 N.W. 742, 743–44 (1902).

 *Whallon* and its progeny make it clear that a party is not entitled to a jury trial if that same type of action did not entitle a party to a jury trial at the time the Minnesota Constitution was adopted. Thus, under the Minnesota Constitution, Olson would be entitled to a jury trial in her cause of action if a party raising that same theory for relief at the time the Minnesota Constitution was adopted also would have been entitled to a jury trial. It is this legal principle that drives our analysis. However, our application of this principle is complicated by our need to analyze current practice and pleading in the context of 1850's jurisprudence and because Olson is requesting relief based on "promissory estoppel," which, as a labeled doctrine, did not enter our legal lexicon until the early twentieth century. Samuel Williston & George J. Thompson, *Williston on Contracts* § 139 (rev. ed.1936).[3] Because promissory estoppel did not exist as a labeled doctrine at the time the Minnesota Constitution was adopted, the focus of our

inquiry must be on whether Minnesota's territorial courts guaranteed the right to a jury trial in the type of action Olson pleaded in her complaint. *See Morton Brick & Tile Co. v. Sodergren,* 130 Minn. 252, 254–55, 153 N.W. 527, 528 (1915).

 In *Morton,* we reiterated our earlier holding that the purpose of Minn. Const. art. I, § 4 is to recognize the right to a jury trial as it existed at the time the Minnesota Constitution was adopted. *Morton,* 130 Minn. at 254, 153 N.W. at 528. We stated:

> In actions originally actions at law either party may demand a jury trial. In actions which, according to the former practice, were equitable actions pure and simple neither party can demand a jury trial as of right as to any issue. In mixed actions, that is, in actions where legal issues are united with equitable issues, the legal issues are triable by a jury and the equitable issues by the court.

*Id.* (citations omitted). We then went on to say "the label affixed by the pleader" does not determine the nature of the controversy, and "[t]he prayer for relief is not conclusive" either. *Id.* at 255, 153 N.W. at 528. Rather, it is the nature and character of the controversy that determines whether or not the action is legal or equitable. *Id.; cf. Roske v. Ilykanyics,* 232 Minn. 383, 389, 45 N.W.2d 769, 774 (1951) (holding that the nature of the plaintiff's action based on the theory of quasi-contract entitled him to a jury trial because the theory of quasi-contract "developed as a branch of the common law * * *").[4]

---

**3.** In his treatise on contracts, Williston states, "since [the promisee] relies on a promise and not on a misstatement of fact, the term 'promissory' estoppel or something equivalent should be used to mark the distinction." Samuel Williston & George J. Thompson, *Williston on Contracts* § 139 (rev. ed.1936).

**4.** The special concurrence's reliance on *Roske* is misplaced. In *Roske,* we did not equate implied contracts, quasi contracts, and the doctrine of promissory estoppel-all three of which have unique elements. 232 Minn. at 389, 45 N.W.2d at 773. An implied contract is a contract in the legal sense-an actual con-

Thus, Minnesota's territorial courts guaranteed the right to a jury trial when the nature of a plaintiff's action was at law. The plaintiff was not entitled to a jury trial when the nature of the plaintiff's action was equitable. *E.g., Smith v. Bailen,* 258 N.W.2d 118–121 (Minn.1977); *Parsons Elec. Co. v. Village of Watertown,* 283 Minn. 505, 509, 169 N.W.2d 20, 23 (1969); *Landgraf v. Ellsworth,* 267 Minn. 323, 329, 126 N.W.2d 766, 770 (1964). It is within this context that we examine the nature of Olson's claim when determining whether she has a right to a jury trial. We proceed with this examination by looking at promissory estoppel's historical origins.

Promissory estoppel's origins lie in the early equity decisions of England's Chancery courts, which were the first courts to grant relief to plaintiffs who "had incurred detriment on the faith of the defendant's promise * * *." J.B. Ames, *The History of Assumpsit,* 2 Harv. L.Rev. 1, 14 (1888). The Chancery court's power to validate and enforce promises predicated on good-faith reliance was based on that court's imperial authority to decide matters pursuant to the principles of "Conscience, Good Faith, Honesty, and Equity." General Writ, 1349, 18 Edw. 3 (Eng.); 1 Spencer W. Symons, *Pomeroy's Equity Jurisprudence* § 35, at 40 (5th ed.1941). A hallmark of the Chancery court's early decisions was the desire to compensate a plaintiff for harm suffered as a result of the plaintiff's good-faith reliance on a defendant's otherwise unenforceable promise. Cases enforcing promises unsupported by consideration on the basis of good-faith reliance have appeared throughout English jurisprudence ever since. *E.g., Wheatley v. Low,* 79 Eng. Rep. 578 (1673).

As the power and influence of the Chancery courts grew, the common-law courts "advised pleaders to pay more attention to actions on the case," which were personal actions within the jurisdiction of the common-law courts. Ames, *supra* at 14. The common-law courts then sanctioned the action of assumpsit to provide relief to plaintiffs pleading actions on the case, and dependence on the Chancery courts to enforce promises predicated on reliance declined but did not disappear. *Id.* The relief provided by the common-law courts under the writ of assumpsit was based on the plaintiff's consideration in the form of action or forbearance in reliance on the promise, *i.e.,* detrimental reliance as a form of consideration. *Cf. Coggs v. Bernard,* 92 Eng. Rep. 107 (K.B.1703). In contrast, the Chancery courts provided equitable relief based solely on the plaintiff's good-faith reliance. Thus, the English Chancery and common-law courts sanctioned their own distinct forms of a reliance-based cause of action.[5]

---

tract, which entitles a plaintiff to legal remedies. *McArdle v. Williams,* 193 Minn. 433, 438–39, 258 N.W. 818, 820–21 (1935). Conversely, a quasi contract creates a legal obligation much like an actual contract, but a quasi contract does not require a promise or privity between the parties. *Town of Balkan v. Village of Buhl,* 158 Minn. 271, 275, 197 N.W. 266, 267 (1924). In contrast, the doctrine of promissory estoppel does not create a legal obligation like a contract because the doctrine is not a consideration substitute. *Constructors Supply Co. v. Bostrom Sheet Metal Works,* 291 Minn. 113, 120, 190 N.W.2d 71, 75 (1971). Rather, promissory estoppel is founded on a promise and is used to enforce the promise whenever fairness so requires.

5. Here, the special concurrence misses the point of the majority's analysis. Our analysis recognizes the marked distinctions between the historical grounds for a cause of action based on equitable good-faith reliance and the distinct cause of action based on the common-law principle of detrimental reliance in the form of action or forbearance. The Chancery Court's cause of action based on good-faith reliance evolved into what we now label promissory estoppel, and the common-law courts' cause of action based on detrimental

American courts adopted the Chancery court's equitable cause of action based on good-faith reliance to enforce promises unsupported by consideration—not as a consideration substitute, but rather as a doctrine based on reliance that the courts could use to prevent injustice. *See, e.g., Randon v. Toby*, 52 U.S. (11 How.) 493, 519, 13 L.Ed. 784 (1850); *Faxton v. Faxon*, 28 Mich. 159, 161 (1873). Eventually, the American courts characterized this line of cases as "promissory estoppel," and identified the key elements of the doctrine of promissory estoppel as (1) a promise, (2) the promisee's right to rely on the promise and the promisor's duty to prevent reliance, and (3) harm suffered in reliance on the promise. 3 Eric Mills Holmes, *Corbin on Contracts* § 8.12 (Joseph M. Perillo ed., rev. ed., West 1996). Over time, the doctrine of promissory estoppel evolved, and courts began to focus on the promisee's right to rely rather than the promisor's duty to prevent reliance. *Hoffman v. Red Owl Stores*, 26 Wis.2d 683, 133 N.W.2d 267, 273–75 (1965). As the doctrine developed, many courts adopted the Restatement of Contracts § 90 (1932) (setting out the elements of promissory estoppel), but in Minnesota, we limited relief available under Restatement of Contracts § 90 to the extent necessary to prevent injustice. *See Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.*, 291 Minn. 113, 120, 190 N.W.2d 71, 75 (1971). For jurisdictions adopting the Restatement of Contracts § 90, the equitable remedy was not a mechanical calculation, but rather it was determined ad hoc on a case by case basis. *See C & K Eng'g Contractors v. Amber Steel Co.*, 23 Cal.3d 1, 151 Cal.Rptr. 323, 587 P.2d 1136, 1140 (1978). In contrast,

when a plaintiff pleaded a common-law cause of action based on detrimental reliance as a consideration substitute, the legal remedy consisted of compensating the plaintiff for the full value of the promise. *Cf. Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 266–67 (Minn. 1980) (holding that it was not unreasonable for the jury to award lost profits).

In Minnesota, we have consistently recognized and applied the equitable aspects of promissory estoppel.[6] As early as 1858, we recognized a theory of relief based on harm suffered as a result of relying on a promise. *Emmet & Keifer v. Rotary Mill Co.*, 2 Minn. 286 (Gil.248) (1858). In *Emmet*, we stated that "[h]ad the plaintiffs relied upon a promise made by the defendants to pay for the lumber furnished * * * they should have so pleaded," but we did not discuss whether the nature of such a cause of action is legal or equitable. *Id.* at 291 (Gil. at 251). Later, in *Tice v. Russell*, we enforced a purchaser's promise to waive his legal rights as to the time of redemption with respect to a foreclosure sale. 43 Minn. 66, 69, 44 N.W. 886, 887 (1890). Our decision allowed the debtor to redeem her house within a reasonable time after the foreclosure instead of within the time allowed by the statute of limitations. *Id.*

Our first case to apply the label of promissory estoppel to a cause of action as a potential basis for relief was *Horan v. Keane (In re Stack's Estate)*, 164 Minn. 57, 204 N.W. 546 (1925). In *Horan*, the issue was enforcement of a charitable subscription unsupported by consideration. *Id.* at 58, 204 N.W. at 546. While we did not

---

reliance in the form of action or forbearance evolved into a form of consideration.

**6.** The special concurrence opines that the actions from which promissory estoppel evolved sounded in both law and equity. However, a

review of the authority relied on by the special concurrence indicates that the cause of action from which promissory estoppel evolved "sounded" only in equity.

base our decision in *Horan* on promissory estoppel, we did recognize that other courts were beginning to apply this doctrine to enforce charitable subscriptions unsupported by consideration. *Id.* at 61, 204 N.W. at 547. In addition, in *Constructors* we reaffirmed the equitable character of promissory estoppel when we stated that "[p]romissory estoppel is not a substitute for acceptance, consideration, or mutuality, but a doctrine based on reliance which courts may use in a proper case to prevent injustice." 291 Minn. at 120, 190 N.W.2d at 75.

More recently in *Ruud v. Great Plains Supply, Inc.*, we stated that promissory estoppel is a creature of equity. 526 N.W.2d 369, 372 (Minn.1995). In *Ruud*, we relied heavily on our earlier cases and stated that the "application of promissory estoppel requires the analysis of three elements: (1) Was there a clear and definite promise? (2) Did the promisor intend to induce reliance, and did such reliance occur? (3) Must the promise be enforced to prevent injustice?" *Id.* We relied on this definition again in our recent decision in *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000).[7]

This historical review of our case law and the doctrine of promissory estoppel leads us to the conclusion that in Minnesota the elements of promissory estoppel evolved from the equitable cause of action unique to England's Chancery courts

based on good-faith reliance. This equitable cause of action based on good-faith reliance forms the roots of our modern doctrine of promissory estoppel.[8] Because the elements of these actions are consistent, what we now generally label as promissory estoppel is an equitable form of action based on good-faith reliance.

That is not to say, however, that any action a claimant labels as "promissory estoppel" has its roots in good-faith reliance, and not all actions that have come to be labeled as promissory estoppel are invariably equitable. It is important not to be distracted by labels. Further, because the remedy sought is not conclusive as to the nature of the action, it is also important not to put the focus on the prayer for relief as the special concurrence appears to have done. *Morton*, 130 Minn. at 255, 153 N.W. at 528. It is only when we look to the elements pleaded in a particular cause of action that we can ascertain the true nature and character of the controversy. *Id.*, 130 Minn. at 254, 153 N.W. at 527. Therefore, we must now examine the nature and character of Olson's pleadings to determine whether she actually seeks equitable relief. If Olson's cause of action is based on equitable good-faith reliance, her cause of action is equitable in nature and the Minnesota Constitution does not entitle her to a jury trial.

Olson has labeled Count III of her complaint "Promissory Estoppel." She then asserts that Cameron promised her

---

7. The special concurrence concludes that in *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn.1981), we recognized that promissory estoppel is a principle of contract law. However, such a conclusion is inconsistent with our jurisprudence. If *Grouse*, as the special concurrence suggests, constituted a recognition of the legal qualities of promissory estoppel, we would have elevated promissory estoppel to a consideration substitute, and-in the process-upset a decade-

long history of jurisprudence following our decision in *Constructors*, 291 Minn. at 120, 190 N.W.2d at 75 (holding that promissory estoppel is not a substitute for consideration).

8. Our recognition of the equitable grounding of promissory estoppel is consistent with the case law from other states that also recognizes the equitable nature of promissory estoppel. *Holmes*, supra §§ 8.11–8.12.

"that any value resulting from Syntech would belong to both of them" in exchange for her resources and contributions to Syntech. She requests that the court enforce Cameron's alleged promise by providing her with a "fair share of the value accrued to [Cameron through the sale of Syntech] as a result of her contributions." She specifically asserts that (1) Cameron made a promise that he knew or should have known would induce her to continue working for Syntech without compensation, (2) she was justified in relying on his promise, and (3) fairness requires that the court provide her with a fair share of the value of Syntech. She argues that she is entitled to a jury trial on this count because "promissory estoppel grows out of contract law, and a contract claim is a paradigmatic legal claim." We disagree.

In essence, Olson is urging us to ignore the nature and character of her action. As we have already stated, our cases have consistently rejected an analysis that focuses on the label affixed by the pleader or on the prayer for relief. Instead, we look beyond the label and the prayer for relief to determine the actual nature of the cause of action pleaded. When we follow Justice Holmes' admonition to look straight at the "thing"[9] and focus on the elements of Olson's cause of action, we see that she pleaded a cause of action based on good-faith reliance, which has its roots in equity and is based on equitable principles. Olson's complaint alleged that Cameron made her a promise, she was justified in relying on the promise, and enforcement of the promise is necessary to prevent injustice. We conclude that Olson's cause of action under Count III of her complaint is an equitable action.

Therefore, we hold that the lower courts did not err in denying Olson a jury trial. Our holding, however, does not alter our case law making it clear that a district court has the discretion to decide whether the fact finder in an equitable action will be the judge or a jury. *Uselman v. Uselman,* 464 N.W.2d 130, 137 (Minn.1990), *superseded on other grounds* by Minn. Stat. § 549.21; *see Radloff v. First Am. Nat'l Bank,* 470 N.W.2d 154, 159 (Minn. App.1991).

## II.

We next address Olson's argument that even if she is not guaranteed a jury trial under the Minnesota Constitution, Minn. R. Civ. P. 38.01 entitles her to a jury trial because she seeks monetary relief. Construction and application of a rule of procedure is a legal issue which we review de novo. *State v. Nerz,* 587 N.W.2d 23, 24–25 (Minn.1998).

Minn. R. Civ. P. 38.01 provides:

In actions for the recovery of money only, or of specific real or personal property, the issues of fact shall be tried by a jury, unless a jury trial is waived or a reference is ordered.

Minn. R. Civ. P. 38.01. This rule defines the scope of the right to a jury trial in Minnesota, but it does not enlarge or diminish the historical right to a jury trial guaranteed by the Minnesota Constitution. *Indianhead Truck Line, Inc. v. Hvidsten Transp., Inc.,* 268 Minn. 176, 192, 128 N.W.2d 334, 346 (Minn.1964). In *Indianhead,* the plaintiff sued for specific performance of a contract and also sought monetary damages for the period of time

---

9. Our conclusion in *Morton* is consistent with Justice Oliver Wendell Holmes' admonition that "[t]he greatest danger [in accomplishing an inaccurate legal analysis] ... is that of being misled by ready-made generalizations, and of thinking only in phrases to which as lawyers the judges have become accustomed, instead of looking straight at things * * *." *Lorenzo v. Wirth,* 170 Mass. 596, 49 N.E. 1010, 1011 (1898).

between nonperformance and the start of trial. *Id.* The plaintiff argued that because he sought monetary damages for a breach of contract, Minn. R. Civ. P. 38.01 guaranteed his right to a jury trial. *Indianhead,* 268 Minn. at 192, 128 N.W.2d at 346. We stated that Rule 38.01 "neither enlarges nor diminishes the historical right to a jury trial." *Indianhead,* 268 Minn. at 192, 128 N.W.2d at 346. We then rejected the plaintiff's argument, holding that the "award of interim damages in this case is not to be classed as an award of damages for breach of contract." *Id.* at 192–93, 128 N.W.2d at 346. We also noted that the "compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages." *Id.* (quoting J.E. Macy, Annotation, *Specific Performance: Compensation or Damages Awarded Purchaser for Delay in Conveyance of Land,* 7 A.L.R.2d 1204, 1206 (1949)).

We followed the same analytical steps used in *Indianhead* in an earlier case discussing Mason's Minn.Stat. § 9288 (1927). *See Coughlin v. Farmers & Mechs. Sav. Bank,* 199 Minn. 102, 104, 272 N.W. 166, 167 (1937). Mason's Minn.Stat. § 9288 provided that in "actions for the recovery of money only, or of specific real or personal property, or for a divorce on the grounds of adultery the issues of fact shall be tried by a jury * * *." Mason's Minn. Stat. § 9288. This statute was in force at the time of the adoption of the Minnesota Constitution and the specific language of the statute was merely intended "to preserve in substance the common law distinction between actions at law and suits in equity." Mason's Minn.Stat. § 9288 annot. 2. Minn. R. Civ. P. 38.01 reflects the language of Mason's Minn.Stat. § 9288 and also serves the same purpose of preserving the historical right to a jury trial inviolate. *See* 1A David F. Herr & Roger S. Hay-

dock, *Minnesota Practice Civil Rules Ann.,* § 38.4 (3d ed.1998).

In *Coughlin,* the only two issues before us were whether a decedent was mentally competent when he established certain trust accounts and whether those trust accounts were testamentary in character. 199 Minn. at 104, 272 N.W. at 167. At stake was whether the decedent's trusts vested during his lifetime or whether they were part of his estate. *Id.* The plaintiff, administratrix of her husband's estate, argued that the trust accounts did not vest and were part of the decedent's estate. *Id.* at 103, 272 N.W. at 167. She sought the recovery of the money in those accounts. *Id.* We held that the "fact that the relief asked is the recovery of money does not give a right to a jury trial. The question is to be determined by looking to the character of the issues to be tried as made by the pleadings." *Id.* (citing *Morton,* 130 Minn. at 255, 153 N.W. at 528). We determined that the issues pleaded in the complaint were equitable, and therefore the plaintiff was not entitled to a jury trial. *Id.* at 104, 272 N.W. at 167.

Our case law supports the conclusion that Minn. R. Civ. P. 38.01 does not enlarge or diminish the historical right to a jury trial guaranteed by the Minnesota Constitution. Further, under the rule, the mere fact that monetary relief is sought does not automatically create a right to a jury trial. *See Swanson v. Alworth,* 168 Minn. 84, 91, 209 N.W. 907, 909 (1926). The type of remedy sought is not determinative of that party's right to a jury trial. *Morton,* 130 Minn. at 255, 153 N.W. at 527. Rather, the key question remains whether the action pleaded in the complaint is legal in nature and character and therefore gives rise to the right to a jury trial. *Id.*

We already have concluded that an action for relief based on promissory estop-

pel is equitable in nature and does not invoke the right to a jury trial guaranteed by the Minnesota Constitution. We also have concluded that Minn. R. Civ. P. 38.01 does not expand the historical right to a jury trial guaranteed by the Minnesota Constitution. We therefore hold that the district court did not err in concluding that Minn. R. Civ. P. 38.01 does not provide an alternative basis entitling Olson to a jury trial in her equitable action.

### III.

 Olson also petitioned for review arguing that she was entitled to a jury trial in her action for relief based on equitable estoppel. We previously have held that equitable estoppel is an equitable doctrine. *N. Petrochemical Co. v. United States Fire Ins. Co.,* 277 N.W.2d 408, 410 (Minn.1979). We also have held that a plaintiff pleading an equitable action is not entitled to a jury trial as a matter of right. *Morton,* 130 Minn. at 254, 153 N.W. at 528. Therefore, we hold that Olson is not entitled to a jury trial in her equitable action, and the district court did not err when it denied Olson's request for a jury trial on these grounds.

Affirmed.

RUSSELL A. ANDERSON, Justice (concurring specially).

I concur in the result but write separately because I believe that a legal action with the attendant right to a jury trial is consistent with promissory estoppel.

The right to a jury trial is inviolate for those actions and issues that were known at common law in the Territory of Minnesota when the Minnesota Constitution was adopted in 1857. *See* Minn. Const. art. I, § 4; *Rognrud v. Zubert,* 282 Minn. 430, 433, 165 N.W.2d 244, 247 (1969); *Whallon*

*v. Bancroft,* 4 Minn. 109 (Gil. 70) (1860). The general rule for determining whether an action is legal, as opposed to equitable, is set forth in *Morton Brick & Tile Co. v. Sodergren:* "[I]t is not the label affixed by the pleader, but the nature and character of the controversy, that determines whether or not the action is legal or equitable." 130 Minn. 252, 255, 153 N.W. 527, 528 (1915). I concur that appellant does not have the right to a jury trial because the nature and character of appellant's action is equitable. I disagree, however, that all actions in promissory estoppel are invariably equitable.

An action that is legal in nature and character is consistent with promissory estoppel. Promissory estoppel is, first of all, a principle of contract law. *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn.1981). It is not a doctrine that simply adds to the facts a missing element of a binding contract but is an independent basis for enforcement of a promise based on reliance. *Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.,* 291 Minn. 113, 120, 190 N.W.2d 71, 75 (1971). Promissory estoppel "is the name applied to a contract implied in law where no contract exists in fact. The effect of promissory estoppel is to imply a contract from a unilateral or otherwise unenforceable promise coupled by detrimental reliance on the part of the promisee." *Del Hayes & Sons, Inc. v. Mitchell,* 304 Minn. 275, 283, 230 N.W.2d 588, 593 (1975).

Second, while both equitable and legal remedies are available under promissory estoppel, legal remedies may be sufficient. *See Christensen v. Minneapolis Mun. Employees Ret. Bd.,* 331 N.W.2d 740, 750 (Minn.1983) ("As recognized by the Restatement, promises binding through estoppel are entitled to normal enforcement

remedies of contract law.").[1] In *Cohen v. Cowles Media Co.* (*Cohen II*), on remand from the U.S. Supreme Court, we upheld a jury award on the theory of promissory estoppel even though the plaintiff argued breach of contract to the jury. 479 N.W.2d 387, 389–92 (Minn.1992). The jury was instructed:

> A party is entitled to recover for a breach of contract only those damages which: (a) arise directly and naturally in the usual course of things from the breach itself; or (b) are the consequences of special circumstances known to or reasonably supposed to have been contemplated by the parties when the contract was made.

*Id.* at 392. We declined to order a retrial on the basis of the jury instruction, concluding that the jury instruction provided an appropriate damages remedy for the broken promise whether considered under a breach of contract or promissory estoppel theory. *Id.*

Third, the common law action of assumpsit provided reliance-based recovery for breach of a promise in territorial Minnesota when the Minnesota Constitution was adopted in 1857. *See* Restatement (Second) of Contracts § 90, cmt. a ("It is fairly arguable that the endorsement of informal contracts in the action of assumpsit rested historically on justifiable reliance on a promise."); *Messenger v. Miller*, 2 Pin. 60, 64 (Wis.1847) (reviewing an assumpsit action in territorial Wisconsin); *Brewster v. Leith*, 1 Minn. 56 (Gil.40) (1851) (reviewing an assumpsit action in territorial Minnesota); *Bidwell v. Madison*, 10 Minn. 13 (Gil.1, 7) (1865) (discussing assumpsit shortly after the Minnesota Constitution was adopted). In *Bidwell* we observed that assumpsit was available for the breach of all "simple" contracts. 10 Minn. at 13. Simple contracts include informal promises that are "enforceable without any expression of assent by the promisee and without any consideration in the sense of an equivalent given in exchange." 3 Eric Mills Holmes, Corbin on Contracts § 8.1 (Joseph M. Perillo ed., rev. ed., West, 1996).

Assumpsit means literally "he promised." 1 Arthur Linton Corbin, *Corbin on Contracts* § 1.18 (Perillo ed., rev. ed., West 1993). Historically, relief based on detrimental reliance on a promise was first recognized in the Chancery courts, but, under the theory of assumpsit, recovery based on detrimental reliance on a promise was adopted by common law courts in England as early as the mid 16th century. J.B. Ames, *The History of Assumpsit*, 2 Harv. L.Rev. 1, 16–17 (1888); Holmes, *supra*, § 8.11; *see also Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 825 (2d Cir.1994) ("[T]he protean doctrine of 'promissory estoppel' eludes classification as either entirely legal or entirely equitable, and the historical evidence is equivocal. * * * [I]ts application in any particular case depends on the context in which it appears."). Good faith or justifiable reliance was integral to assumpsit, just as detrimental reliance was integral to recovery in equity. *See* Restatement (Second) of Contracts, § 90, cmt. a; Ames, *supra*, at 14 ("[E]quity gave relief, before 1500, to a plaintiff who had incurred detriment on the faith of the defendant's promise * * *.") . As an action at law, assumpsit was entitled to a jury trial. J.B. Ames, *The History of Assumpsit II—Implied Assumpsit*, 2 Harv. L.Rev. 53, 57 (1888); Corbin, *supra*, § 1.18.

---

**1.** The reporter of section 90 of the Restatement (Second) of Contracts commented, "A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate." Restatement (Second) of Contracts § 90 cmt. d (1981).

Assumpsit is a doctrinal antecedent to promissory estoppel. Holmes, *supra,* § 8.11 (stating that promissory estoppel "is a venerable, ancient form of relief with historical origins in both the common law action of assumpsit and early equity decisions."); *Merex A.G.,* 29 F.3d at 824. Like promissory estoppel, relief was available in assumpsit through a variety of remedies. In an early 20th-century decision, the South Carolina Supreme Court said, "Assumpsit * * * includes every case by simple contract * * * from whence a promise, either express or implied, can arise. The damages to be recovered must always depend upon the nature of the action and the circumstances of the case." *Welborn v. Dixon,* 70 S.C. 108, 49 S.E. 232, 235 (1904). Minnesota courts have applied a variety of remedies under assumpsit. *E.g., Boardman v. Ward,* 40 Minn. 397, 401, 42 N.W. 202, 203 (1889) (providing relief for the reasonable value of services rendered). In assumpsit, damages were measured by the extent of the harm suffered by the plaintiff in reliance on the defendant's promise. Holmes, *supra,* § 8.8; *see Reynolds v. Franklin,* 41 Minn. 279, 281–82, 43 N.W. 53, 54 (1889) ("When one party to a contract refuses to fulfill upon his part, the other may rescind, if he chooses, and recover in assumpsit the money he has paid, or the value of what he has done for the other party for which he has received no benefit.").

Promissory estoppel's lineage includes the common law action of assumpsit, but, like assumpsit, has its roots in equity. Because promissory estoppel is both a legal and equitable doctrine, our analysis of whether a right to a jury trial attaches should be whether the particular action raises a legal or equitable issue. We have held that an action that is seemingly legal in form may not entitle a plaintiff to a jury trial if the essence of the action is equitable. *Coughlin v. Farmers & Mechs. Sav. Bank,* 199 Minn. 102, 104, 272 N.W. 166, 167 (1937) (holding that plaintiff's claim for money damages actually involved setting aside and invalidating trusts, an equitable action); *Swanson v. Alworth,* 168 Minn. 84, 91, 209 N.W. 907, 909–10 (1926) (holding that a contract claim actually was an equitable claim alleging a fiduciary duty to account for profits); *Morton,* 130 Minn. at 255, 153 N.W. at 528 (holding that a claim for recovery of money only was "essentially an action to charge the defendant as a trustee of certain property, the legal title to which he holds, and to require him to account as such trustee"). Conversely, an action that is grounded in equitable principles may entitle a plaintiff to a jury trial if the essence of the controversy is legal. For example, this court has held that particular actions claiming unjust enrichment and the recovery of money had and received, two theories grounded in equitable principles,[2] were legal in character and entitled to trial by jury because they sought to recover specified sums arising out of separate sales. *Thorn v. Geo. A. Hormel & Co.,* 206 Minn. 589, 592–94, 289 N.W. 516, 517–18 (1940). We have also said that one cannot abrogate the right to a jury trial by seeking to characterize an action as declaratory. *State Farm Mut. Auto. Ins. Co. v. Skluzacek,* 208 Minn. 443, 447, 294 N.W. 413, 415 (1940); *Gilbertson v. Indep. Sch. Dist. No. 1,* 208 Minn. 51, 54, 293 N.W. 129, 130 (1940).

We also adopted this approach with respect to a kindred doctrine to promissory estoppel—quasi contract. *Roske v. Ilykanyics,* 232 Minn. 383, 45 N.W.2d 769 (1951).[3] In *Roske* the plaintiffs sought the

2. *See, e.g., Seastrand v. D.A. Foley & Co.,* 144 Minn. 239, 242–43, 175 N.W. 117, 119 (1919).

3. Quasi-contract is an obligation "created by law for reasons of justice. Such obligations

recovery of money under the theory of quasi-contract for services rendered. *Id.* at 388, 45 N.W.2d at 773. A husband and wife orally agreed to give up their jobs and care for the wife's elderly parents in exchange for the parents' farm when the older couple died. *See id.* at 385, 45 N.W.2d at 771–72. Conflict arose and the daughter and her husband sued under quasi-contract to recover the value of improvements made to the farm and the reasonable value of services under an oral contract. *See id.* at 386, 45 N.W.2d at 772. Importantly, the Roskes did not sue for a share of ownership of the farm or for specific performance of the oral contract. The court held that the plaintiffs were entitled to a jury trial even though the right to recover was governed by equity because the remedy sought was legal in nature and was adequate. *See id.* at 389, 45 N.W.2d at 774.

Quasi-contract is grounded even more firmly in equity than promissory estoppel, because, unlike promissory estoppel, quasi-contract requires no promise and is "independent of any real or expressed intent of the parties." *Id.* at 389, 45 N.W.2d at 774.[4] In *Roske* we recognized that "[t]he right to recover [in quasi-contract] is governed by principles of equity, but the remedy is governed by the law, much as if an actual contract had been established. The legal remedy being adequate, the court may not decide the case as one sounding in equity and thereby deprive the parties to

the right of a jury trial in the absence of a waiver of such jury." *Id.* (citations omitted).[5] The majority's decision is not consistent with this court's decision in *Roske* because it precludes a complainant from receiving a jury trial in a promissory estoppel action even though the complainant has an adequate legal remedy.

In this case, plaintiff claims in her promissory estoppel count that she contributed significant financial and personal resources to Syntech and now has been unjustly denied the value that accrued to defendant and that the defendant has been unjustly enriched. Plaintiff repeats these claims in her equitable estoppel count. In light of these pleadings, I would uphold the trial court's conclusion that the plaintiff seeks an ownership interest in Syntech—a type of action that is equitable in nature. I would therefore uphold the trial court's determination that plaintiff does not have the right to a jury trial because the thrust of this action in promissory estoppel is equitable in nature.

LANCASTER, Justice (concurring specially).

I join in the special concurrence of Justice Russell A. Anderson.

---

were ordinarily enforced at common law in the same form of action (assumpsit) that was appropriate to true contracts * * *." *McArdle v. Williams*, 193 Minn. 433, 438, 258 N.W. 818, 820 (1935) (quoting Restatement (First) of Contracts § 5 cmt. a (1932)).

**4.** *See Town of Balkan v. Village of Buhl,* 158 Minn. 271, 275, 197 N.W. 266–67 (1924) ("[W]here one has money or property belonging in equity and good conscience to another, the latter is entitled to it, and * * * the law in

such a case will enforce, in order to accomplish justice, what is best known as a quasi contractual obligation, so called because it is precisely like a contract as to method of enforcement and result upon the parties.").

**5.** The civil jury instruction guides provide jury instructions for promissory estoppel. 4 Minn. Dist. Judges Ass'n, *Minnesota Practice–Jury Instruction Guides, Civil,* JIG 20.50 (4th ed.1999).